IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL McQUEEN,

                          Plaintiff,

                                           Civ. Action No.
    vs.                                  9:08-CV-799 (DNH/DEP)

COUNTY OF ALBANY, *et al.*,

                          Defendants.

_____

APPEARANCES:                       OF COUNSEL:

FOR PLAINTIFF:

MICHAEL McQUEEN, *pro se*
Clinton Correctional Facility
P.O. Box 2000
Dannemora, New York 12929

FOR DEFENDANTS ALBANY COUNTY
AND THOMAS WIGGER:

NAPIERSKI, VANDENBURGH        SHAWN BROUSSEAU, ESQ.
LAW FIRM
296 Washington Ave. Extension
Albany, New York 12203

FOR DEFENDANT CORRECTIONAL
MEDICAL SERVICES:

THUILLEZ, FORD LAW FIRM        KELLY M. MONROE, ESQ.
20 Corporate Woods Blvd.
Albany, New York 12211

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Michael McQueen, a New York State prison inmate who is
proceeding *pro se* and *in forma pauperis*, commenced this action pursuant
to 42 U.S.C. § 1983 alleging deprivation of his civil rights arising out of his
pretrial detention at the Albany County Correctional Facility.  In his
complaint, plaintiff alleges that he slipped and injured himself while exiting
a shower area and was thereafter denied medical treatment, in violation of
his constitutional rights.

Currently pending before the court are two separate but similar
motions by the defendants for summary judgment dismissing plaintiff's
claims against them.  In their motions, defendants argue that plaintiff's
claims against them are subject to dismissal on a variety of grounds,
including procedurally based upon his failure to exhaust available
administrative remedies before commencing suit, and on the merits.
Having carefully considered the record now before the court in light of
defendants' arguments and plaintiff's failure to properly oppose the
defendants' motions, while I find the existence of triable issues of fact
surrounding the defense of exhaustion, precluding dismissal on this

procedural basis, I recommend that the motions be granted, in relevant part, and that plaintiff's complaint be dismissed on the merits.

I.    BACKGROUND[1]

After being arrested on charges not disclosed in the record, plaintiff was temporarily housed at the Albany County Correctional Facility ("ACCF") as a pretrial detainee from October 2, 2007 until March 19, 2008, when he was transferred into the custody of the New York State Department of Correctional Services (the "DOCS").  *See* ACCF Medical Record (Dkt. No. 22-5).  Upon his arrival at ACCF, plaintiff was screened by defendant Correctional Medical Services and found to have no physical complaints.  *See id.*

On January 22, 2008, as he was exiting the facility's shower area, McQueen slipped on a puddle of water and fell.[2]  Complaint (Dkt. No. 1) p. 3.  When he slipped, plaintiff "pulled" his right side and felt a sharp pain in

_____

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.2d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

[2]    There is some discrepancy in the record as to the date of plaintiff's accident.  In his complaint and during his deposition testimony, plaintiff alleged that the incident occurred on January 22, 2008.  *See* Complaint ( Dkt. No. 1) p. 3; *see also* Deposition Transcript ("Tr.") (Dkt. No. 19-5) p. 19.  Later during his deposition, however, plaintiff testified that the incident occurred on January 14, 2008, which coincides with the date of his first sick call request.  Tr. (Dkt. No. 19-5) pp. 21-22.

the lower right side of his abdomen.  *Id.*  Plaintiff reported this incident and his injury to the corrections officer on duty and was told to complete a sick call request.  *Id.*

The first request for health services from plaintiff contained in the record relating to a problem on his right side is dated January 14, 2008, and states, "I believe I have an [sic] hernia on my top right side, witch [sic] is causing me discomfort and pain."[3]  *See* ACCF Medical Record (Dkt. 22-5); *see also* Tr. (Dkt. No. 19-5) pp. 21-22.  McQueen was seen by a nurse the following day, who consulted with a physician and prescribed Motrin for his pain.  *See* ACCF Medical Record (Dkt. No. 22-5).  Plaintiff was administered Motrin over the period of January 15 through 25, 2008.  *See id.*

On January 31, 2008, plaintiff lodged another complaint of a right side hernia and requested to see a doctor.  *See* ACCF Medical Record (Dkt. No. 22-5).  Plaintiff was seen the following day by a physician's assistant, who prescribed a ten-day supply of Motrin to be taken at night for the pain.  Tr. (Dkt. No. 19-5) p. 23.  On that occasion, McQueen was told that the physical examination revealed a small lump, but there was

---

[3]      Plaintiff testified that the January 14, 2008 request was his second, and that he never received a copy of the first one that he filled out.  Tr. (Dkt. No. 19-5) p. 22.  Plaintiff did not identify the date or testify as to the substance of the first request.

4

nothing more that could be done for him.  *Id.* at 24.

The record reflects that McQueen did not complain about his condition again until more than two weeks later when, on February 17, 2008, he completed another request for health services identifying a right side hernia and pain.  *See* ACCF Medical Record (Dkt. No. 22-5).  Plaintiff was again seen the following day by a member of the facility's medical staff, on this occasion a nurse.  *Id.*  The record of plaintiff's examination on that date reveals a diagnosis of "intermittent bulging [of the] upper right inguinal area with discomfort", and notes plaintiff's request to see a physician.  *Id.*

Plaintiff was examined on February 19, 2008 by Dr. Michael Salzman.  Tr. (Dkt. No. 19-5) p. 25; *see also* Affidavit of Michael A. Salzman, M.D. ("Salzman Aff.") (Dkt. No. 22-9) ¶ 6.  Based upon his examination, Dr. Salzman diagnosed McQueen as suffering from a mild right side femoral hernia, one-half centimeter in size, with an estimated onset of about two months.[4]  *See* ACCF Medical Record (Dkt. No. 22-5). Dr. Salzman states that although plaintiff wrote on the health services request form that he was experiencing pain, McQueen did not voice any

---

[4]     Plaintiff testified to having experienced a hernia when he was a child, and that he had it surgically repaired.  Tr. (Dkt. No. 19-5) at pp. 13-14.

5

complaints of pain during his visit of February 19, 2008, and the doctor's examination revealed no objective or subjective signs of pain.  Salzman Aff. (Dkt. No. 22-9) ¶ 6.

According to Dr. Salzman, a mild hernia does not require surgical intervention provided that it is not incarcerated.  Salzman Aff. (Dkt. No. 22-9) ¶ 7.  Upon examination of plaintiff's hernia, Dr. Salzman determined that it was not.  *Id.*  Dr. Salzman advised plaintiff of his diagnosis as well as the fact that the hernia was not life threatening and did not require immediate surgery.  Tr. (Dkt. No. 19-5) p. 25.  Dr. Salzman recommended to plaintiff that if he was going home, he should see his own medical provider regarding removal of the hernia, adding that if he was being transferred to the custody of the DOCS, it would be that agency's responsibility to treat him.  *Id.* at pp. 25-26.  Dr. Salzman provided plaintiff with 650 milligrams of Tylenol and a stool softener, which was administered from February 19 through 29, 2008, and released him back to his unit.  *Id.*

The following day, plaintiff left ACCF for a court appearance and subsequently was transferred into the custody of the DOCS.  Tr. (Dkt. No. 19-5) p. 26.  Since that time McQueen has not had surgery to repair the hernia, takes ibuprofen occasionally for pain, and has only been restricted

6

in his ability to work out and lift a coffee urn.  *Id.* at pp. 27, 33.

Albany County Sheriff James L. Campbell reports that a review of ACCF records reflects that plaintiff did not file any informal or formal grievances or grievance appeals while housed at that facility.  Affidavit of James L. Campbell ("Campbell Aff.") (Dkt. No. 19-10) ¶ 5.  According to the plaintiff, however, on January 30, 2008, while still housed at ACCF he hand wrote a document labeled by him as an "inmate grievance complaint to Albany County Correctional Facility", complaining of a dangerous slippery condition resulting from a puddle in the shower area where his accident occurred and requesting the installation of rubber mats to prevent future similar occurrences.  *See* Attachment to Complaint (Dkt. No. 1).  The written complaint did not include any reference to his injuries or complaints regarding his medical treatment.  Plaintiff also wrote a letter to Superintendent Wigger on February 8, 2008, referencing his earlier grievance, advising of his accident and injuries, and on this occasion complaining that he was denied medical treatment.  *See id.*  Plaintiff received no response to either the grievance or his letter, nor did he take any further action regarding the complaints voiced in those documents. Tr. (Dkt. No. 19-5) pp. 30, 38.

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on July 23, 2008, and was thereafter granted leave to proceed *in forma pauperis*. Dkt. Nos. 1, 8.  His complaint names three defendants, including the County of Albany; Thomas Wigger, the superintendent of the ACCF; and Correctional Medical Services.  In it, plaintiff asserts a claim of cruel and unusual punishment based upon an alleged deliberate indifference of medical officials to the hernia allegedly sustained after he slipped and fell.  As relief, plaintiff seeks compensatory damages.

Following joinder of issue and the close of discovery, all defendants moved for summary judgment dismissing plaintiff's claims against them on a variety of grounds.[5]  Dkt. Nos. 19, 22.   In their motions, defendants argue that 1) plaintiff's claims are subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit; 2) plaintiff has failed to demonstrate entitlement to compensatory damages; 3) plaintiff cannot establish deliberate indifference to a serious medical need; 4) plaintiff's claims against the superintendent of the facility

---

[5]      The County of Albany and defendant Wigger are jointly represented by counsel, and Correctional Medical Services is separately represented by another attorney.  The defendants have filed two separate but similar motions for summary judgment.

must be dismissed for lack of personal involvement; 5) plaintiff has failed to demonstrate a sufficient basis for holding Albany County or Correctional Medical Services liable; and 6) plaintiff's pendent state law claims, if any, are barred by virtue of his failure to file a notice of claim.

Despite the passage of the deadline for doing so, which was extended upon his request, *see* Text Order of March 16, 2009, plaintiff has failed to respond to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.     <u>Plaintiff's Failure to Oppose Defendants' Motions</u>

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motions, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motions.

11

Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion.  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.)[6]; *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  Before such a motion can be granted under such circumstances, however, the court must review the motion to determine whether it is facially meritorious.  *See Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp. 2d 229, 231-32 (N.D.N.Y. 2001) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.); *see also* N.D.N.Y.L.R. 7.1(b)(3).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences.  This court's rules require that

---

[6]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

"[a]ny motion for summary judgment shall contain a Statement of Material Facts setting forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y.L.R. 7.1(a)(3).  By electing not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged.  Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[7]  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

I recommend that the court follow this well-established practice when reviewing defendants' motions for facial sufficiency and, notwithstanding McQueen's *pro se* status, accept the facts set forth in defendants' Local Rule 7.1(a)(3) Statements as uncontroverted, in light of

---

[7]     According to Local Rule 7.1(a)(3), "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *See* N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original).

plaintiff's failure to respond to those statements.

  C. Failure to Exhaust

  While plaintiff's complaint alleges that he exhausted available administrative remedies before commencing suit, and attaches two documents which he claims to have filed with officials at ACCF complaining of the dangerous condition in the shower and subsequently of the alleged denial of medical treatment for his injuries, Albany County and defendant Wigger assert that a review of ACCF records shows that plaintiff filed no grievances or appeals while housed at that facility. Defendants therefore argue that plaintiff failed to avail himself of the inmate grievance procedure available at ACCF and that having failed to exhaust administrative remedies, he cannot now maintain this action.

  With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions.  An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with

14

respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct.

2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003,

at *5-6 (E.D.N.Y. Jan. 31, 2007).  This limitation is intended to serve the

dual purpose of affording "prison officials an opportunity to resolve

disputes concerning the exercise of their responsibilities before being

haled into courtl[,]" and to improve the quality of inmate suits filed through

the production of a "useful administrative record."  *Jones v. Bock,* 549

U.S. 199, 204, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see*

*Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v.*

*Testman,* 380 F.3d 691, 697 (2d Cir. 2004).  "[T]he PLRA's exhaustion

requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they

allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122

S. Ct. at 992 (citation omitted).

       In the event a defendant named in such an action establishes that

the inmate plaintiff failed properly to exhaust available remedies prior to

commencing the action, any unexhausted claims are subject to dismissal.

See Pettus v. McCoy, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); see also Woodford, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  Woodford, 548 U.S. at 95, 126 S. Ct. at 2388; see also Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (citing Woodford).  While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  Macias, 495 F.3d at 43 (quoting Johnson, 380 F.3d at 697-98) (emphasis omitted).

     In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[8]  Macias, 495 F.3d at 41; see

_____

     [8]     As will be seen, whether the Hemphill test survives following the Supreme Court's decision in Woodford, has been a matter of some speculation.  See, e.g., Newman v. Duncan, No. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y.

16

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed algorythm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[9]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

          a)    <u>Availability of Remedy</u>

The record reveals that inmates at ACCF have available to them an

_____

Sept. 26, 2007) (McAvoy, S.J. & Homer, M.J.) .

    [9]    In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14; *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

inmate grievance procedure ("IGP") for complaining of conditions of their confinement.  Brousseau Aff. (Dkt. No. 19-2) Exh. F.  That policy sets forth both informal and formal channels for handling grievances, providing for grievance forms to be made available to inmates, and refers inmates to the inmate handbook for further instructions.  *Id.*

Despite an inmate's entitlement to file and pursue a grievance in accordance with the IGP prescribed by ACCF, there are circumstances under which the grievance procedure nonetheless could be deemed not to have been available to the plaintiff.  *See Hemphill*, 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, . . . or where defendants' behavior prevents plaintiff from seeking administrative remedies."  *Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable).  When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated

18

individual of ordinary firmness [would] have deemed them available."
*Hemphill*, 38 F.3d at 688 (quotations and citations omitted); *see also*
*Hargrove,* 2007 WL 389003, at *8 n. 15.

> b)   Presentation of Defense/Estoppel

The second prong of the *Hemphill* analysis focuses upon "whether
the defendants may have forfeited the affirmative defense of non-
exhaustion by failing to raise or preserve it, or whether the defendants'
own actions inhibiting the inmate's exhaustion of remedies may estop one
or more of the defendants from raising the plaintiff's failure to exhaust as a
defense."  *Hemphill,* 380 F.3d at 686 (citations omitted).

> c)   Special Circumstances

The third, catchall factor to be considered under the Second
Circuit's prescribed exhaustion rubric focuses upon whether special
circumstances have been plausibly alleged which, if demonstrated, would
justify excusing a plaintiff's failure to exhaust administrative remedies.
*Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,*
2007 WL 389003, at *10.  Among the circumstances potentially qualifying
as "special" under this prong of the test is where a plaintiff's reasonable
interpretation of applicable regulations regarding the grievance process
differs from that of prison officials and leads him or her to conclude that

the dispute is not grievable.  *Giano*, 380 F.3d at 676-77; *see also*

*Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Hemphill*, 380 F.3d

at 688).

      In this case, the first prong of the *Hemphill* test is easily satisfied.

As was previously discussed, defendants have produced a copy of the

Albany County Sheriff's Department's Inmate Grievance Procedure, which

is applicable to inmate grievances at ACCF.  It thus appears that there

was an internal remedy available to the plaintiff.

      As to the second and third prongs of the analysis, however, they are

not so easily dispensed with.  The evidence in the record bearing upon the

issue of whether plaintiff filed any grievance related to the matters set out

in his complaint is equivocal.  Based upon the record before the court it

appears that on January 30, 2008 plaintiff submitted a written complaint,

designated as an "inmate grievance complaint", though not filed utilizing

the prescribed form, complaining of a constant puddle in the shower area

creating a slippery condition and requesting the installation of rubber

mats; no mention is made in that letter of the failure to provide requested

medical treatment.  The record also reveals that just over a week later, on

February 8, 2008, plaintiff wrote a letter to Superintendent Wigger, in

which he referenced his earlier grievance and also alleged that he had

slipped and fallen in a puddle in the shower area, causing him to sustain a

hernia, and also complained that he had been refused medical treatment,

in violation of his Eighth Amendment rights.  *See* Attachments to

Complaint (Dkt. No. 1).   Plaintiff admits that he did not receive any

response to either his grievance or the letter to defendant Wigger, and

that he did not file any other grievances or appeals regarding the incidents

at issue.  It is unclear whether defendants dispute having received

the documents attached to plaintiff's complaint.  In support of their motion,

they merely assert somewhat obliquely that a review of ACCF records

reveals that McQueen did not file any informal or formal grievances or

appeals.

        Undeniably, the document that plaintiff labeled as an inmate

grievance does not complain of medical indifference.  Plaintiff's

subsequent letter of February 8, 2008, however, does include this

complaint.  Ordinarily, under an analogous procedure prescribed for use

by New York State prison inmates, letters to DOCS employees and

officials are not considered as sufficient to satisfy the grievance

exhaustion requirement.  *See Colon v. Farrell*, No. 01-CV- 6480(FE), 2004

WL 2126659, at *5 (W.D.N.Y. Sept. 23, 2004) (noting that "letters of

complaints to DOCS employees and officials do not satisfy the grievance

procedure exhaustion requirement"); *Conner v. Hurley*, No. 00 Civ.

8354(LTS)(AJP), 2004 WL 885828, at *2 (S.D.N.Y. Apr. 26, 2004) (letters

to facility superintendent and DOCS commissioner "may not be deemed

substitutes for strict compliance with requirements of the IGP").

In this case, the IGP at issue outlines a protocol for inmates to follow

in registering both informal and formal complaints.  *See generally* Albany

County Sheriff's Dep't IGP (Dkt. No. 19-8).  In accordance with the formal

process, the Tour Commander is required to provide assistance to an

inmate in the preparation of the written grievance "if assistance is

requested or obviously necessary because of language barriers or literacy

problems."  *Id.* at § II.G.  While an inmate grievance form is attached to

the IGP, the written procedures provided to the court do not explicitly

mandate that an inmate utilize that form and, more importantly, the

procedure does not expressly identify with whom a written grievance must

be filed.[10]  In fact, the Albany County Sheriff's Department grievance

procedure seems to require an effort at informal resolution before the

formal process is instituted and, in the event that the informal process is

_____

[10]     A note appearing at the end of the Albany County Sheriff's Department
IGP states, "NOTE: Inmate instructions regarding filing grievances are contained within
the Inmate Rules and Regulations Handbook."  No further information regarding the
Inmate Rules and Regulations Handbook has been provided to the court, and there is
nothing before the court that contradicts my analysis of the relevant procedures as
discussed above.

unsuccessful, appears to delegate the responsibility of initiating the formal grievance process to a corrections officer.  *See id.* at §§ II.F and II.G.

When viewed in light of the Albany County Sheriff's Department's prescribed procedures, it is at least arguable that plaintiff's February 8, 2008 letter to the superintendent sufficed as an informal grievance and placed defendants on notice of plaintiff's complaint.  It is not clear whether Superintendent Wigger denies receiving the letter.  It is obvious, however, that this unresolved issue raises a material question of fact as to whether defendants' actions, or inaction, interfered with McQueen's ability to exhaust administrative remedies.  Conceivably, plaintiff's letter was delivered to the superintendent, and by their inaction defendants prevented plaintiff from pursuing available internal remedies.  Drawing all inferences and resolving all ambiguities in plaintiff's favor, I am therefore unable to say no reasonable factfinder could conclude that plaintiff did not properly apprise defendants, both procedurally and substantively, of his claim concerning medical indifference, and therefore recommend denial of the portion of defendants' motions seeking dismissal of plaintiff's claim for failure to exhaust.

D.     Plaintiff's Medical Indifference Claims

The centerpiece of plaintiff's complaint in this action is his claim that

he was denied medical treatment for the injuries allegedly sustained after he slipped and fell.  In their motions, defendants assert that the record does not support a finding of liability on plaintiff's medical indifference claim, both because plaintiff's condition was not sufficiently serious and because defendants were not indifferent to that condition.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003).  In *Benjamin*, the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50-51.  Following *Benjamin*, however, there was significant uncertainty surrounding the precise standard to be applied to claims of deliberate medical indifference brought by pretrial detainees.  While it was clear that such claims were subject to analysis under the Due Process Clause of the Fourteenth Amendment, *Bryant v. Maffucci*, 923 979, 983

(2d Cir. 1991), the precise contours of the obligation imposed thereunder

had not been definitively established by the Second Circuit until its recent

decision in *Caiozzo v. Koreman*, wherein the court pronounced that

"[c]laims for deliberate indifference to a serious medical condition or other

serious threat to health or safety of a person in custody should be

analyzed under the same standard irrespective of whether they are

brought under the Eighth or Fourteenth Amendment."  581 F.3d 63, 72 (2d

Cir. 2009).

     The Eighth Amendment's prohibition of cruel and unusual

punishment encompasses punishments that involve the "unnecessary and

wanton infliction of pain" and are incompatible with "the evolving

standards of decency that mark the progress of a maturing society."

*Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976);

*see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084

(1986) (citing, *inter alia*, *Estelle*).  While the Eighth Amendment does not

mandate comfortable prisons, neither does it tolerate inhumane treatment

of those in confinement; thus the conditions of an inmate's confinement

are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan*, 511 U.S.

825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452

U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  Claims that prison officials

25

have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle*, 429 U.S. at 104, 97 S. Ct. at 291.

### 1.   Serious Medical Need

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'". *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324). A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted). A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*, 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment", a condition that

"significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance*, 143 F.3d at 701 (citation and internal quotations omitted); *Lafave v. Clinton County*, No. CIV. 9:00CV0774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance, the record leads invariably to the conclusion that plaintiff's hernia is not objectively sufficient to qualify as constitutionally significant.  There is no indication that plaintiff's condition was emergent or one that could produce death, degeneration, or extreme pain.  Plaintiff's subjective complaints of pain are not substantiated by any objective evidence, and he variously described what he felt as "discomfort" and "pain."  After his first two requests for treatment, which came a week apart, plaintiff did not require medical services again until more than two weeks later, all suggesting that plaintiff was by no means in constant or extreme pain, or suffering from a dire physical condition.

Significantly, Dr. Salzman states that plaintiff did not voice any complaints of pain during his examination of February 19, 2009, the hernia was not incarcerated and therefore did not necessitate surgery, and any surgery at that time would have been merely elective.  Dr. Salzman's opinion is buttressed by the fact that even as of the time of his deposition,

27

approximately ten months after the treatment complained of, plaintiff had

not undergone surgery and, by his own admission, experienced pain only

occasionally.  The evidence thus establishes that, at worst, plaintiff's

hernia caused him to suffer intermittent pain and/or discomfort, which is

patently insufficient to objectively prove that his condition was serious.

Indeed, other courts have recognized that an inguinal hernia is not

objectively serious enough to satisfy the objective prong of the Eighth

Amendment test.  *Arroyo v. City of New York*, No. 99 Civ. 1458, 2003 WL

22211500, at *2-3 (S.D.N.Y. Sept. 25, 2003); *see also*, *Day v. Lantz*, No.

3:07-CV-388, 2009 WL 801612, at *3 (D. Conn. Mar. 25, 2009) (citing

cases).

For these reasons, I find that plaintiff's hernia was not sufficiently

serious to warrant constitutional protection.

### 2.    Deliberate Indifference

In addition to establishing the existence of a serious medical need,

to prevail on a medical indifference claim a plaintiff must also establish

indifference to that condition on the part of one or more of the defendants.

*Leach v. Dufrain*, 103 F. Supp. 2d 546.  Deliberate indifference, in a

constitutional sense, exists if an official "knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware

28

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979); *Waldo v. Goord*, No. 97-CV-1325, 1998 WL 713809, at *2 (same) (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. & Hurd, M.J.).

It should be noted that the constitution does not afford prisoners a right to medical treatment of their choosing; the question of that diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted). "Charges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo*, 2003 WL 22211500, at * 2 (citing *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 292).

The record now before the court overwhelmingly demonstrates the lack of merit of this prong of plaintiff's claim of deliberate indifference.

29

The evidence in the record flatly contradicts the notion that plaintiff was exposed to an excessive risk to his health and safety.  Each time plaintiff requested medical attention he was seen within twenty four hours, and on each occasion was examined and given medication for pain.  At best, plaintiff's apparent complaint that the hernia was not surgically removed amounts to nothing more than a disagreement as to the method of treatment and fails to rise to the level of indifference necessary to support a medical indifference claim under the Fourteenth Amendment. *See Wandell v. Koenigsmann*, 99-CV-8652, 2000 WL 1036030, at *5 (S.D.N.Y. July 27, 2000) (differences in opinion between a doctor and a prisoner over appropriate medication is simply disagreement over treatment plan and does not implicate the Eighth Amendment); *see also Grant v. Burroughs*, 96-CV-2753, 2000 WL 1277592, at *5 (S.D.N.Y. Sept.8, 2000) (prisoner denied pain medication does not have a constitutional right to treatment of his choice).  Accordingly, even if plaintiff's hernia were sufficiently serious to implicate the due process clause of the Fourteenth Amendment, the evidence shows that defendants were not deliberately indifferent to that medical need.

## IV.    SUMMARY AND CONCLUSION

This action stems from an alleged slip and fall in the shower occurring on January 14, 2008, as a result of which plaintiff claims to have sustained a hernia.  Thereafter, plaintiff contends, he requested but was denied medical treatment for his injuries.  Although defendants have asserted that the action must be dismissed as a result of plaintiff's failure to exhaust administrative remedies, the record establishes the existence of triable issues of material fact in this regard, and I am therefore not recommending dismissal on this procedural basis at this juncture.  As to the merits of plaintiff's medical indifference claim, however, the record now before the court firmly establishes that plaintiff's condition was not sufficiently serious to trigger constitutional protection and, moreover, that he was provided with timely and adequate medical treatment each time it was requested.  I therefore recommend dismissal of plaintiff's medical indifference claim on the merits, and in light of that recommendation have not addressed the other arguments raised in the defendants' motions.[11]

---

[11]     To the extent that plaintiff's complaint may be regarded as encompassing state law claims against defendants, I recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed."  *Stephenson v. Albany County Policymakers*, Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).  In light of this recommendation, I have declined to address defendants' argument that plaintiff's state law claims must be dismissed for failure to file a notice of claim.

Based upon the foregoing it is hereby

RECOMMENDED, that defendants' motions for summary judgment (Dkt. Nos. 19 and 22) be GRANTED, in relevant part, and that all of plaintiff's claims against defendants be DISMISSED, with prejudice with respect to plaintiff's federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within TEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a) and (d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this

court's local rules, and to mail an additional copy, addressed to the

plaintiff at the Green Haven Correctional Facility.[12]


David E. Peebles
U.S. Magistrate Judge


Dated:    December 22, 2009
          Syracuse, New York


---

[12]    Plaintiff is listed on the docket sheet as being confined in the Clinton
Correctional Facility.  A search of the New York State Department of Correctional
Services inmate locator website, however, reflects that he may now be housed in the
Green Haven Correctional Facility.  If so, then plaintiff has failed to fulfill his obligation
to notify the court of any change of address while this action is pending.  *See*
N.D.N.Y.L.R. 10.1(c).



Page 1

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Anthony ROBINSON, Plaintiff,
v.
Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.
**No. 96-CV-169 (RSP/DNH).**

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated by the
New York State Department of Corrections ("DOCS"),
sued two DOCS employees, alleging that they violated his
right to due process in the course of a disciplinary
proceeding and subsequent appeal. On September 9, 1997,
defendants moved for summary judgment. Defendants
argued that plaintiff failed to demonstrate that the fifty

days of keeplock confinement that he received as a result
of the hearing deprived him of a liberty interest within the
meaning of the Due Process Clause. Plaintiff did not
oppose the summary judgment motion, and Magistrate
Judge David N. Hurd recommended that I grant it in a
report-recommendation filed April 16, 1998. Plaintiff did
not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner,* 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is approved;
and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy of this
order on the parties by ordinary mail.
HURD, Magistrate J.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1998.
Robinson v. Delgado
Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me

the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he
was charged with engaging in violent conduct and conduct
which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause

shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. § 1681 *et
seq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first

step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

> FN2. Of course, as mentioned, because one of
> the evaluators may have written the question, and
> the question may have been specific to just that
> one student, one of the two or three evaluators
> may have known the student's identity regardless
> of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,
authored and graded two of her exams. She passed one of
them, specialty, and failed the other, research methods.
Roopnarine, incidently, gave her a pass on specialty, and
a marginal on research methods. Thus it was another
professor who gave her a failing grade on research
methods, resulting in her failure of the exam. As to the
other failed exam, child development, it is undisputed that
Roopnarine neither wrote the question, nor graded the
answer.

Pursuant to the University's procedures, she retook the two

exams she failed in January of 1997. Despite being given
the same questions, she only passed one, child
development. She again failed research methods by getting
marginal and fail grades from her evaluators. This time,
Roopnarine was not one of the evaluators for either of her
exam questions.

After this second unsuccessful attempt at passing research
methods, plaintiff complained to the chair of the CFS
department, Dr. Norma Burgess. She did not think that she
had been properly prepared for her exam, and complained
that she could no longer work with Roopnarine because he
yelled at her, was rude to her, and was otherwise not
responsive or helpful. She wanted a new advisor. Plaintiff
gave no indication, however, that she was being sexually
harassed by Roopnarine.

Though plaintiff never offered any additional explanation
for her demands of a new advisor, Burgess eventually
agreed to change her advisor, due to plaintiff's insistence.
In March of 1997, Burgess and Roopnarine spoke, and
Roopnarine understood that he would no longer be
advising plaintiff. After that time period, plaintiff and
Roopnarine had no further contact. By June of that year,
she had been assigned a new advisor, Dr. Mellisa
Clawson.

Plaintiff then met with Clawson to prepare to take her
research methods exam for the third time. Despite
Clawson's repeated efforts to work with plaintiff, she
sought only minimal assistance; this was disturbing to
Clawson, given plaintiff's past failures of the research
methods exam. Eventually, Clawson was assigned to write
plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual
harassment was in August of 1997, soon before plaintiff

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue

of material fact exists on this question.

*4 Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not

constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer, 151 F.3d at 54.* Yet, as the Circuit has admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally

examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

not instructed that the sequence occur in either particular order. *See id.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual

harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.* Accord *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

summary judgment); *Eng v. Beth Israel Med. Ctr.*, 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See *Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that

there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam. FN8 In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See*

*Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim. FN9

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

## CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that

Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
that the operative date is between August 27, 2004

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that

facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.<sup>FNS</sup> Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann

("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form FN7 to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." FN8 *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. FN9 *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law

at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." FN10 Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II; Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log

Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

### Discussion

### (1)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

> ***6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford, 126 S.Ct. at 2383; Ruggiero, 467 F.3d at 174; Williams, 418 F.Supp.2d at 100-01.* The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord, 380 F.3d 670, 675 (2d Cir.2004); see also Woodford, 126 S.Ct. at 2382-83* ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford, 126 S.Ct. at 2386).* Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford, 126 S.Ct. at 2382).*

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford, 126 S.Ct. at 2382).*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

(4)

Page 10

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at \* 8-11; *Sloane,* 2006 WL 3096031, at \*4; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175; *Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.'")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> **FN13.** Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second

Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at \*5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at \*3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the

submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense.

Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465, at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at \*8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at \* 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at \*4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))


E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)


END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted
> pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
> are deemed admitted because they are supported
> by the record evidence and Plaintiff failed to
> submit an opposing statement of material facts as
> required by Rule 7.1(a)(3). Plaintiff was
> specifically advised by Defendants of his
> obligation to file an opposing statement of
> material facts and to otherwise properly respond
> to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

**II. DISCUSSION**

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.,* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the

instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

**III. CONCLUSION**

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the
Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. [FN2] *See* Compl. (Docket No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

> **FN2.** Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

**I. Background**

The facts are presented in the light most favorable to Newman as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU"). [FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an

inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

> **FN3.** SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**II. Discussion**

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

**A. Standard**

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

**B. Exhaustion**

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11.

Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 952054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

*of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

**\*3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003); [FNS] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See* *Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at \*3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also* Hemphill, 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See* Hemphill, 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

> [FN6]. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

**\*5** Therefore, it is recommended that defendants' motion on this ground be granted.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

### C. Eighth Amendment[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should have know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. See Farmer v. Brennan, 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. Id. at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. Id. at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions,

fellow inmates "attempted to rape/physical[ly] assault" him. See Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. See Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; see also Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. See Brown v. Saj, No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing Lewis v. Casey, 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. See Boddie v. Schnieder, 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); see also Brown, 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); see also Thompson v. Carter, 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

Therefore, in the alternative, it is recommended that defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))


*of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. §
636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).


N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304
(N.D.N.Y.)


END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that

Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
that the operative date is between August 27, 2004

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that

facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> [FN5.](#) Hargrove has made contradictory statements about being placed in "keep lock" or "lock up." It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann

("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his [Section 1983](#) claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form FN7 to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." FN8 *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. FN9 *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law

at 16-21; County Defs.' 56.1 Statement at ¶ ¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II; Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log

Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

## Discussion

### (1)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

### Summary Judgment Standard

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

### (2)

### Prison Litigation Reform Act

### a. Purpose of the Prison Litigation Reform Act

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

### b. The Exhaustion Requirement

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford, 126 S.Ct. at 2383; Ruggiero, 467 F.3d at 174; Williams, 418 F.Supp.2d at 100-01.* The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord, 380 F.3d 670, 675 (2d Cir.2004); see also Woodford, 126 S.Ct. at 2382-83* ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth, 532 U.S. at 734).*

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford, 126 S.Ct. at 2387.* "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero, 467 F.3d at 176* (citing *Woodford, 126 S.Ct. at 2385* (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007),* "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero, 467 F.3d at 176* (quoting *Woodford, 126 S.Ct. at 2386).* Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero, 467 F.3d at 176* (citing *Woodford, 126 S.Ct. at 2382).*

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004),* and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams, 418 F.Supp.2d at 101. See also Sloane v. W. Mazzuca, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006)* (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero, 467 F.3d at 176* (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford, 126 S.Ct. at 2382).*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal

step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

(4)

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at \* 8-11; *Sloane,* 2006 WL 3096031, at \*4; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175; *Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second

Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at \*5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at \*3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the

submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g.,* Sims v. Blot, No. 00-CV-2524, 2003 WL 21738766, at \*4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); Santiago v. Meinsen, 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Hemphill, 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense.

Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g.,* Sloane, 2006 WL 3096031, at \*8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf.* Ziemba v. Wezner, 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); Feliciano v. Goord, No. 97-CV-263, 1998 WL 436358, at \*2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See* Ruggiero, 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); Sloane, 2006 WL 3096031, at \*8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); Hernandez, 2006 WL 2109465, at \*4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at \*8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at \* 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at \*4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

*12 Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))


E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)


END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that

Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
that the operative date is between August 27, 2004

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that

facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann

("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form FN7 to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." FN8 *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. FN9 *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law

at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." FN10 Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II; Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log

Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

**(1)**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

### Summary Judgment Standard

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

### (2)

### Prison Litigation Reform Act

### a. Purpose of the Prison Litigation Reform Act

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

### b. The Exhaustion Requirement

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383; *Ruggiero,* 467 F.3d at 174; *Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal

step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

(4)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at \* 8-11; *Sloane,* 2006 WL 3096031, at \*4; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175; *Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at \*5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at \*3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be argued that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the

submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at \*4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense.

Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at \*8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at \*2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at \*8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465, at \*4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at \*8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at \* 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

(5)

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at \*4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

adjudication." *Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002).* In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn, 191 F.Supp.2d at 455* (quoting *Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir.1989).*

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold, 2006 WL 71672, at *1, *3* (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn, 191 F.Supp.2d at 446* (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002)* (citing *McMunn, 191 F.Supp.2d at 461).*

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold, 2006 WL 71672, at *5* (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic, 221 F.Supp.2d at 439-444* (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn, 191 F.Supp.2d at 445* (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))


E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)


END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2126659 (W.D.N.Y.)
(Cite as: 2004 WL 2126659 (W.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Danny COLON, Plaintiff,
v.
C.O.P. FARRELL, et al., Defendants.
**No. 01-CV-6480FE.**

Sept. 23, 2004.

DECISION AND ORDER

FELDMAN, Magistrate J.

*Procedural Background*

**\*1** In accordance with the provisions of 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court for all dispositive matters, including trial. (Docket # 32). Before the Court is defendants' motion for summary judgment. (Docket # 57). Plaintiff has not filed any papers in response to the defendants' dispositive motion.

*Relevant Facts*

The claims at issue stem from four distinct incidents allegedly occurring while Colon was an inmate at Woodburne Correctional Facility ("Woodburne") and at Lakeview Correctional Facility ("Lakeview"), from June through October 2001.

*1. June 23, 2001:* The first incident occurred on June 23, 2001. Colon alleges that he and two other inmates were walking up the staircase outside of the recreation area at Woodburne when they were approached by Corrections Officers Downs and Costello. (Colon Dep. p. 20, In 14-18, p. 23, 10-12).[FN1] Colon and the other inmates were told to get up against the wall. (Colon Dep. p. 23, In 10-11). The officers asked them for their ID cards. (Colon Dep. p. 24, In 3-5). They were each pat frisked, but no contraband was found, (Colon Dep. p. 24, In 23-34; p. 25, In 1-2). After the pat frisk, the two other inmates were released. (Colon Dep. p. 25, In 2-4).

FN1. References are to the page and line number of the transcript of the July 30, 2003 Deposition of plaintiff Colon.

The officers then pinned Colon's arm behind his back and asked him where he was "locked." (Colon Dep. p. 25, In 5, 23). According to Colon, one of the officers grabbed him by the throat and choked him. (Colon Dep. p. 27, In 4-6). The officers then pinned Colon's face and chest to the wall. (Colon Dep. p. 29, In 5-12). Sergeant Krom came up the stairs and the officers turned Colon around to face him. (Colon Dep. p. 29, In 16-17). The officers continued to restrain Colon, pulling his arms behind his back. (Colon Dep. p. 29, In 20-22). Krom spoke to Colon about Colon's arrival at Woodburne and how the prison is run. (Colon Dep. p. 29, In 22-24). Colon alleges that Krom referred to him as a "mother f ing n er," told Colon he needed to abide by his rules and regulations, and then allegedly kicked Colon in the groin. (Colon Dep. p. 31, In

Page 2

Not Reported in F.Supp.2d, 2004 WL 2126659 (W.D.N.Y.)
(Cite as: 2004 WL 2126659 (W.D.N.Y.))

7-13). Colon was given a misbehavior report for being "out of place." (Colon Dep. p. 37, ln 7-10). At his hearing, Colon plead guilty to being "out of place." (Colon Dep. p. 37, ln 11-13).

Colon alleges that due to Downs and Costello's choke hold, he was unable to breath for 2-3 minutes. (Colon Dep. p. 48, ln 13-19). Colon claims that because of the incident he could barely move his arm for two days. (Colon Dep. p. 42, ln 23-24; p. 43, ln 1). Colon also alleges that he had pain in his groin area for a few days and had trouble urinating because of Krom's kick. (Colon Dep. p. 47, ln 23-24; p. 48, ln 1-8).

Colon states that he complained to Lieutenant Kiesler about the incident. (Colon Dep. p. 35, ln 17-22). In a letter dated July 25, 2001, Colon complained to the Inmate Grievance Review Committee ("IGRC") about the incident, but his grievance was denied. On August 13, 2001, Colon wrote to Superintendent Moscicki appealing the denial of his grievance. On behalf of Superintendent Moscicki, Captain Bastion sent a letter to Colon on September 10, 2001, denying his appeal. Rather than appealing this decision to the Central Office Review Center ("CORC"), Colon wrote to Donald Selsky, Director, Special Housing/Inmate Disciplinary Program attempting to appeal the decision from the superintendent's hearing regarding the misbehavior report and the denial of his grievance. On September 4, 2001, Selsky affirmed the misbehavior report. There is no record of an appeal by Colon to the CORC of Superintendent Moscicki's decision.

**\*2** *2. July 24, 2001:* The second incident took place on July 24, 2001, at Lakeview during a cell search by Sergeant Holton and Correctional Officers Colt and Theriault. (Colon Dep. p. 55, ln 3-10). Colon had two Korans in his cell which contained a list of names,

addresses and phone numbers of friends and family members. (Colon Dep. p. 58, ln 18-22). The officers confiscated the Korans on the ground that the writings altered the book and issued Colon a misbehavior report. (Colon Dep. p. 57, ln 11-17; p. 55, ln 8-10). After a disciplinary hearing, Colon was found guilty of "possessing an altered item." (Colon Dep. p. 59, ln 12-19).

On July 25, 2001, Colon sent a letter to the IGRC complaining about the confiscation of his Korans, but his grievance was denied. Colon appealed the denial of his grievance to Superintendent Moscicki on August 13, 2001. On August 21, 2001, Colon's appeal was denied. Again, Colon failed to appeal this decision to CORC. Rather, Colon only sent a letter to Father Rithkens, of Catholic Services, on November 18, 2001, requesting another Koran. (Colon Dep. p. 62, ln 3-5). Colon asked Father Rithkens to contact the Iman at Wende Correctional Facility. (Colon Dep. p. 62, ln 16-19). Colon also stated that without a Koran, he was unable to read various passages that are part of the Ramadan celebration and was therefore being deprived of his First Amendment rights. (Colon Dep. p. 67, ln 11-15). It was not until a year later, when he was given a Koran by an inmate at Southport Correctional Facility, that Colon was able to replace the confiscated Koran. (Colon Dep. p. 61, ln 22-24).

*3. September 22, 2001:* The third incident allegedly occurred on September 22, 2001, at Lakeview when Sergeant Hall and Correctional Officers Farrell and Theriault searched Colon's cell after another inmate informed them that Colon had a weapon and a razor. (Colon Dep. p. 70, ln 4-6; p. ln 71, 3-12). As part of the search Colon was subjected to a pat down frisk. (Colon Dep. p. 71, ln 12). During the frisk, Colon alleges that Farrell groped his genitals for "at least 60 seconds" and inserted two fingers into his anus. (Colon Dep. p. 71, 21-24; p. 76, ln 18-24). Colon attempted to complain to

Not Reported in F.Supp.2d, 2004 WL 2126659 (W.D.N.Y.)
(Cite as: 2004 WL 2126659 (W.D.N.Y.))

Sergeant Hall while this was occurring, but Sergeant Hall told Colon to "shut the eff up." (Colon Dep. p. 77, ln 9-14). Colon received a misbehavior report as a result of his actions during the cell search and pat frisk. (Colon Dep. p. 87, ln 11-13). In response to this incident, Colon filed a grievance dated September 22, 2001, alleging sexual and physical abuse. On the same day, Colon sent a letter to the CORC regarding the incident. Colon's grievance was denied by the IGRC in a memorandum dated October 1, 2001.

*4. October 24, 2001:* The fourth incident occurred on October 24, 2001 at Lakeview. Colon and his cell mate were woken up by Corrections Officers Spelburgh and Theriault. (Colon Dep. p. 92, ln 17-18). Spelburgh and Theriault witnessed Colon with his hands in his pants and suspected that Colon was trying to conceal something. (Colon Dep. p. 92, ln 11-12). The officers proceeded to subject Colon to a pat frisk. (Colon Dep. p. 92, ln 20-22). Colon alleges that Theriault frisked his genitals for a minute and a half. (Colon Dep. p. 94, ln 9). While this was occurring, Colon complained to Sergeant Hall, the area supervisor overseeing the pat frisk. (Colon Dep. p. 94, ln 12-15). Sergeant Hall told Colon to turn around, to shut up and be quiet. (Colon Dep. p. 94, ln 18). Colon alleges that Theriault then felt Colon's buttocks and inserted his hand in Colon's anus. (Colon Dep. p. 94, ln 23-24). After Colon attempted to complain to Sergeant Hall again, he was subdued by the officers. (Colon Dep. p. 95, ln 5-6). Colon claims that Spelburgh grabbed him by the handcuffs and pulled him to the ground. (Colon Dep. p. 96, ln 21-23). Colon also alleges that Theriault grabbed him by the legs and Spelburgh put his knee in Colon's back. (Colon Dep. p. 97, ln 16-17).

**3** After undergoing a strip search, Colon was taken to see a nurse. (Colon Dep. p. 98, ln 20-21). Colon complained to the nurse that his leg was hurt during the incident. (Colon Dep. p. 98, ln 22-23). Colon claims that he could

barely walk for a week. (Colon Dep. p. 100, ln 9-10). Colon states that a scar on his back was aggravated and swollen by the take down, but admits that the swelling disappeared within a few days. (Colon Dep. p. 101, ln 17-19; p. 102, ln 2-4). Colon alleges that he suffered nerve damage in his right wrist caused by the handcuffs digging into his wrist. (Colon Dep. p. 102, ln 8-13). He claims that on occasion, he has trouble writing, his hand shakes and it feels numb. (Colon Dep. p. 103, ln 5-8). Colon also states that as a result of the incident he became depressed and was prescribed Zoloft. (Colon Dep. p. 118, ln 15-17).

Colon claims that he filed a grievance regarding the incident on October 24, 2001. (Colon Dep. p. 107, ln 18-20). Colon does not have a copy of the grievance and simply states that the defendants "should have it." (Colon Dep. p. 107, ln 21-22). The defendants deny ever receiving it.

*Discussion*

*A. Summary Judgment Standard:* Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Catanzaro v. Weiden, 140 F.3d 91, 93 (2d Cir.1998).*

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2126659 (W.D.N.Y.)
(Cite as: 2004 WL 2126659 (W.D.N.Y.))

from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must 'set forth such facts as would be admissible in evidence." ' *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.")).

**\*4** In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the district court, we must construe his complaint with particular generosity.") (citations omitted).

*B. Exhaustion of Administrative Remedies:* It is well settled that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to "all inmate suits about prison life." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Where an inmate has failed to

comply with § 1997e(a) prior to commencing suit, the district court should ordinarily dismiss the action without prejudice. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004).

The New York State Department of Corrections has established a three step grievance procedure available to inmates to grieve incidents or occurrences while confined in state prisons.

First, the inmate files a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution Committee ("IGRC"), which is composed of fellow inmates and prison officials. The IGRC must convene a hearing, if necessary, within seven working days, and issue a written decision within two days of the hearing. Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the Central Office Review Committee ("CORC"). The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. § 701.7(c)(4).

*Hemphill v. State of New York,* 2004 WL 1842658, *1 (2d Cir. August 18, 2004).* In *Hemphill, supra,* the Second Circuit provided guidance on the procedure district courts should follow in evaluating whether an inmate has complied with § 1997e(a).
[A] three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available"

Not Reported in F.Supp.2d, 2004 WL 2126659 (W.D.N.Y.)
(Cite as: 2004 WL 2126659 (W.D.N.Y.))

to the prisoner. *Abney v. McGinnis,* 2004 WL 1842647. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 2004 WL 1842669, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba,* 366 F.3d at 163. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 2004 WL 1842652 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003).

**\*5** *Hemphill,* 2004 WL 1842658 at \*5. As set forth below, application of the *Hemphill* analysis to plaintiff's claims results in a finding that Colon failed to completely exhaust the three tiers on all four claims.

*1. June 23, 2001 Incident:* With regard to the alleged assault on June 23, 2001, Colon filed a complaint with the IGRC and appealed the decision to Superintendent Moscicki, thus satisfying the first two steps of the grievance process. However, Colon failed to satisfy the third step which requires an inmate to appeal their grievance to the CORC. Colon's appeal of his misbehavior report does not satisfy the exhaustion requirement. "The general rule is that an appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for an Eighth Amendment excessive force claim, even if the hearing is based on the same set of facts underlying the grievance." *Sweet v. Wende Correctional Facility,* 253 F.Supp.2d 492, 495-96 (W.D.N.Y.2003) (collecting cases). *See Benjamin v. Goord,* 2002 WL 1586880 at \*2 (S.D.N.Y. July 17, 2002) ("[e]xhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for his grievance, even if the underlying facts are the same.").

*2. July 24, 2001 Incident:* Colon similarly failed to appeal to the CORC regarding the alleged incident on July 24, 2001. Although he satisfied the first two steps of the exhaustion requirement when he properly filed a complaint with the IGRC and appealed the decision to Superintendent Moscicki, his letter to Father Rithkens does not satisfy the third step of the grievance process. It is well settled that letters of complaints to DOCS employees and officials do not satisfy the grievance procedure exhaustion requirement. *See Stephenson v. Dunford,* 320 F.Supp.2d 44, 49-50 (W.D.N.Y.2004) (collecting cases); *Curry v. Fischer,* 2004 WL 766433, \*6-7 (S.D.N.Y. April 12, 2004) (letter to prison official does not excuse failure to file timely appeal with CORC.).

*3. September 22, 2001 Incident:* With regard to the alleged September 22, 2001 incident, Colon also failed to properly exhaust his claims. Although he filed a grievance, rather than waiting for a decision, he wrote a letter to the CORC on the same day, thus circumventing the sequential grievance process. "Prisoners must complete all steps of the grievance process *in the proper order.*" *Walters v. Carpenter,* 2004 WL 1403301, \*3 (S.D.N.Y. June 22, 2004) (emphasis added) (collecting cases). Where an inmate fails to follow the sequential steps of an established grievance procedure, the ability of prison personnel to properly address the merits of the grievance is frustrated, thus defeating the very purpose of requiring inmates to fully exhaust administrative remedies before filing a lawsuit.

*4. October 24, 2001 Incident:* With regard to the fourth incident on October 24, 2001, Colon claims that he filed

Page 6

Not Reported in F.Supp.2d, 2004 WL 2126659 (W.D.N.Y.)
(Cite as: 2004 WL 2126659 (W.D.N.Y.))

a grievance, but there is no evidence that IGRC ever
received it. There is also no record of any appeal filed
with the CORC. *See* Declaration of Thomas Eagen
(Docket # 63). Colon's bald assertion in his deposition
testimony that he filed a grievance, without any supporting
or corroborative evidence submitted in response to the
instant summary judgment motion, is insufficient to defeat
a summary judgment motion. *Wilson v. Gantert,* 2004 WL
1591400, *4 (W.D.N.Y. July 12, 2004)* (inmate's bald
assertion that he filed a grievance, standing alone, does not
demonstrate exhaustion sufficient to defeat summary
judgment motion).

**\*6** As to all four incidents, there is no question that
administrative remedies were available to Colon. Indeed,
Colon either initiated or claimed to have initiated the
prison grievance process on all four. Moreover, the
defendants have not forfeited the affirmative defense of
non-exhaustion. The "Sixth Affirmative Defense" in each
answer filed by the defendants specifically alleges that
Colon has failed to exhaust his administrative remedies.
Finally, this Court has considered whether there are any
"special circumstances" that would plausibly justify or
excuse Colon's failure to exhaust each step of the prison
grievance process and has concluded there are none in the
record. Accordingly, I find that Colon has failed to
exhaust available administrative remedies as to each of the
four claims.

*Conclusion*

Based on Colon's failure to exhaust his available remedies
as required by 42 U.S.C. § 1997e(a), the defendants'
motion for summary judgment is granted and plaintiff's
claims are hereby dismissed without prejudice.

SO ORDERED.

W.D.N.Y.,2004.
Colon v. Farrell
Not Reported in F.Supp.2d, 2004 WL 2126659
(W.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 885828 (S.D.N.Y.)
(Cite as: 2004 WL 885828 (S.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Reginald CONNOR, Plaintiff
v.
Officer John P. HURLEY, Officer Dale M. Bissonette,
Green Haven Correctional Facility (Medical Staff),
Green Haven Correctional Facility (Administration),
Defendant.
**No. 00Civ.8354LTSAJP.**

April 26, 2004.

*ORDER*

SWAIN, J.

**\*1** Plaintiff Reginald Connor ("Connor"), a prisoner in Collins Correctional Facility, brought this *pro se* action against two officers, the prison medical staff, and the prison administration. Plaintiff alleges that Defendants Officers Hurley and Bissonette handled him with excessive force during an incident that occurred on September 13, 1997. Plaintiff alleges that the prison medical staff and administration provided him with inadequate medical attention for injuries sustained in his altercation with the officers. Plaintiff seeks relief in the form of monetary damages. Defendants move pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, seeking summary judgment in their favor on the grounds that Plaintiff failed to exhaust his administrative remedies

prior to bringing suit in federal court and also that Plaintiff has failed to properly name a "person" as defendant as required by 42 U.S.C. § 1983 insofar as he seeks to assert claims against Green Haven medical and administrative personnel.

BACKGROUND

*Underlying Claim*

Connor alleges that during a routine pat-frisk on September 13, 1997, Officer Hurley handled him unprofessionally, with excessive force and malicious intent. (Compl. at ¶ 4.) According to Connor's complaint, Officer Hurley observed Connor put an object in his mouth, whereupon Hurley allegedly put his hands on Connor's throat and began to choke him. (*Id.*) Then Officer Bissonette grabbed Connor from behind and wrestled him to the floor. (*Id.*) Connor alleges that he sustained injuries to his neck, shoulder, arm, back, and leg as a result of this altercation. (Compl. at 6.) Connor further alleges that his several attempts to receive proper medical care for these injuries were met with insufficient attention. (*Id.*) Connor seeks compensatory and punitive damages in the amount of 60 million dollars

*Plaintiff's Use Of Administrative Grievance Procedures*

Before bringing this action, Connor attempted to use the grievance procedures available at his correctional facility. First, he alleges that he drafted an informal grievance on September 13, 1997. Defendants claim that this first grievance was never received by the Internal Grievance Reveiew Committee ("IGRC"). (Tr. of January 24, 2003

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 885828 (S.D.N.Y.)
(Cite as: 2004 WL 885828 (S.D.N.Y.))

Case Management Conference, at 2-3.) In the informal grievance Connor alleged that officers Hurley and Bissonette violated standard pat-frisk procedures. (Decl. of Laura Jones Ex. R.) In addition to the informal grievance, Connor sent a letter to Superintendent Christopher Artuz describing his confrontation with Hurley and Bissonette. (*Id.,* Ex. S.) This letter was not dated, but Artuz responded on September 19, 1997. (*Id.,* Ex. T.) On September 18, 1997, Connor wrote a letter to Commissioner Glenn S. Goord in which he once again described the September 13 incident. (*Id.,* Ex. U.) Then starting in December 1997, Connor filed a series of twelve formal grievances alleging inadequate medical attention. (*Id.,* Exs. W-HH.) Connor appealed these decisions to the Superintendent and then to the Central Office Review Committee ("CORC").

## DISCUSSION

**\*2** Summary judgment shall be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). In the summary judgment context, a fact is material "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (internal citation omitted).

Defendants seek dismissal of Plaintiff's complaint on the ground that Plaintiff failed to exhaust his administrative remedies with respect to the claims against Officers

Hurley and Bissonette. The Prison Litigation Reform Act of 1995 (the "PLRA") provides that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any federal law, by a prisoner confined in any jail, prison, or correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C., § 1997e(a) (West 1994 & Supp.2003). In *Porter v. Nussle,* the Supreme Court held that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." 534 U.S. 516, 532 (2002).

New York's Department of Correctional Services has a procedure for dealing with prisoner complaints. This procedure is called the Internal Grievance Procedure ("IGP"). The IGP is mapped out in 7 N.Y.C.R.R. § 701.7. It is well settled that, in order for a prisoner to exhaust his administrative remedies, he or she must complete three steps, which have been summarized as follows:

First, an inmate must file a complaint with the Inmate Grievance Resolution Committee ('IGRC') within 14 days of the alleged event. The IGRC must then investigate and may resolve the issue informally within seven days. If there is no informal resolution, a hearing is held, and the inmate may appeal to the superintendent of the facility within four days of the IGRC's action. Finally, after receiving a response from the superintendent, the prisoner may appeal that decision to the Central Office Review Committee ('CORC') within four days of its receipt. The CORC, in turn, must render a decision within 20 days.

*Harris v. Totten,* 244 F.Supp.2d 299, 233 (S.D.N.Y.2003) (internal citations omitted).

Not Reported in F.Supp.2d, 2004 WL 885828 (S.D.N.Y.)
(Cite as: 2004 WL 885828 (S.D.N.Y.))

Defendants have carried their burden of demonstrating that Connor cannot be deemed to have satisfied the requirements of the IGP, and thereforedid not exhaust his administrative remedies before filing suit in this Court. Even if the informal complaint that Connor allegedly filed on September 13, 1997, satisfies the first step of the IGP, Connor never satisfied the second or third steps by filing an administrative appeal to the superintendent or to the CORC. Connor claims that he never received a response from the IGRC after he filed his first complaint. (This is most likely because the IGRC did not have a record of ever having received the first complaint.) In any event, failure of the IGRC to respond is not material. In order to satisfy the exhaustion requirement, Connor must have appealed to the Superintendent even in the absence of a response from IGRC. The rules "provide that if the determination is delayed, the inmate may appeal to the next level of review, including CORC, without waiting for administrative action." *Mendoza v. Goord,* No. 00 Civ. 0146(GEL), 2002 WL 3654855 at *2 (S.D.N.Y. November 21, 2002). Furthermore, Connor's letters to Superintendent Artuz and to Commissioner Goord may not be deemed substitutes for strict compliance with the requirements of the IGP. *See Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) ("[A] letter to the Superintendent has been expressly held to be 'insufficient' to warrant considering a matter 'effectively grieved' "); *Mendoza,* at *3 (Even though plaintiff "wrote letters of complaints to various prison officials, including the Deputy Superintendent of his institution, the Commissioner of DOCS, and its inspector general ... he does not exhaust his remedies as required by § 1997e(a) unless he pursues the proper channels provided by the state for remedying his situation.") Thus, with respect to Connor's inmate grievances alleging misconduct by Hurley and Bissonette, Connor failed to exhaust his administrative remedies prior to filing a complaint in this Court.

**\*3** Connor did exhaust his administrative remedies with respect to grievances filed after December 1997. Plaintiff followed all three steps of the IGP and appealed the matter all the way up through the CORC. Plaintiff did not, however, name Officers Hurley and Bissonette in these grievances. Therefore, exhaustion of remedies with respect to those grievances cannot give rise to a right to bring suit against Hurley or Bissonette. The only other named Defendants are "Green Haven Correctional Facility (Medical Staff)" and "Green Haven Correctional Facility (Administration)", but neither the "Medical Staff" nor the "Administration" of Green Haven Correctional Facility is a "person" within the meaning of section 1983. Because section 1983 expressly provides for a cause of action against "person[s]" who engage in deprivations of federal rights, the statute "has been interpreted to mean that a plaintiff cannot seek relief directly from the state or one of its agencies without naming a government official as a defendant." *Ferguson v. Morgan,* No. 90 Civ. 6318(JSM), 1991 WL 115759 at *1 (S.D.N.Y. June 20, 1991) (holding that since the correctional facility's "medical staff is not a person under 42 U.S.C. § 1983 the complaint is deficient and must be dismissed.") Plaintiff's section 1983 claims against Green Haven Correctional Facility Medical Staff and Green Haven Correctional Facility Administration must therefore be dismissed.

CONCLUSION

Defendants' motion for summary judgment is granted, and Plaintiff's claims are hereby dismissed without prejudice. The Clerk of Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2004.
Connor v. Hurley
Not Reported in F.Supp.2d, 2004 WL 885828 (S.D.N.Y.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2004 WL 885828 (S.D.N.Y.)
(Cite as: 2004 WL 885828 (S.D.N.Y.))


END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the
Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin,
Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned
for Report-Recommendation by the Hon. David
N. Hurd, United States District Judge, pursuant
to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

**\*1** Plaintiff, *pro se,* Karus LaFave ("LaFave") originally
filed this action in Clinton County Supreme Court. The
defendant filed a Notice of Removal because the
complaint presented a federal question concerning a
violation of LaFave's Eighth Amendment rights (Dkt. No.
1). Currently before the court is the defendant's motion to
dismiss made pursuant to Rule 12(b)(6) and in the
alternative, pursuant to Rule 56(b) of the Federal Rules of
Civil Procedure (Dkt. No. 5). LaFave, in response, is
requesting that the court deny the motion, excuse his
inability to timely file several motions, and to permit the
matter to be bought before a jury [FN2]. After reviewing
LaFave's claims and for the reasons set forth below, the
defendant's converted motion for summary judgment
should be granted.

FN2. It should be noted that the date for
dispositive motions was February 16, 2001. The
defendant's motion to dismiss was filed on
September 29, 2000. On January 9, 2001, this
court converted the defendant's motion to dismiss
to a motion for summary judgment, and gave
LaFave a month to respond. On April 16, 2001,
after three months and four extensions, LaFave
finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983
claiming that the defendant violated his civil rights under
the Eighth Amendment [FN3]. He alleges that the defendant
failed to provide adequate medical and dental care causing
three different teeth to be extracted.

FN3. LaFave does not specifically state that the
defendant violated his Eighth Amendment rights
but this conclusion is appropriate after reviewing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

the complaint.

### III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' " *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain.' " *Id.* at 103, 97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. See *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. See *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. See *Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. See *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. See *Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. See *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 *(citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 137 (2d Cir.1999).*

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi,[FN6] M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell *(Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi,

examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar *(Qudsi Aff., P. 2).* Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication *(Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar *(Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment *(Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar *(Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.*

Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

> FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robert ARROYO, Plaintiff,
v.
THE CITY OF NEW YORK, N.Y.C. Department of
Correction, Hospital Administrator, C-73, St. Barnabas
Hospital Administrator, Dr. "John" Mohammad, First
name being fictitious, real name being unknown, Dr.
Harjinger Bhatti, Dr. Jude Aririguzo, Dr. "John"
August, First name being fictitious, real name being
unknown, Dr. Jean Valcourt, Dr. "John Doe", Full name
being fictitious, real name being unknown, Dr. Sung
Kim, Dr. Ye Hum Kim, the New York City Health and
Hospitals Corporation, St. Barnabus Hospital, St.
Barnabus Correctional Health Systems, Inc., the New
York City Correctional Health Services, the New York
City Department of Health, Defendants.
No. 99 Civ.1458(JSM).

Sept. 25, 2003.

Inmate brought a § 1983 suit, alleging that violation of his
Eighth Amendment right to be free from cruel and unusual
punishment in connection with an eight-month delay of
allegedly necessary surgery for an inguinal hernia. On a
defense motion for summary judgment, the District Court,
Martin, J., held that: (1) inmate failed to exhaust his
administrative remedies, and (2) in any event, the alleged
delay did not amount to cruel and unusual punishment.

Motion granted.

West Headnotes

**[1] Civil Rights 78 ⚷ 1311**

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and
Exhaustion of Other Remedies
            78k1311 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
Inmate, in failing to renew his grievance or otherwise seek
to use an extensive inmate grievance resolution program
in place at correctional facility, did not exhaust his
administrative remedies, as required by the Prison
Litigation Reform Act (PLRA), thus barring his § 1983
suit alleging cruel and unusual punishment in connection
with an eight-month delay of allegedly necessary surgery
for an inguinal hernia; even if he initially thought that he
had been promised prompt surgery after his informal
grievance review, shortly thereafter he obviously knew
that surgery had not been performed, or even scheduled,
and he presented no explanation as to why he did not at
least inquire as to why surgery that he allegedly thought he
had been promised had not been forthcoming. 42 U.S.C.A.
§ 1983; Civil Rights of Institutionalized Persons Act, §
7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[2] Prisons 310 ⚷ 192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In General. Most Cited Cases
(Formerly 310k17(2))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
Alleged eight-month delay of allegedly necessary surgery for an inmate's inguinal hernia did not amount to cruel and unusual punishment under the Eighth Amendment; the hernia was not a serious enough condition to satisfy the objective prong of the test, and as to the subjective prong, all that the inmate alleged was negligence. U.S.C.A. Const. Amend. 8.


OPINION & ORDER


MARTIN, J.


**\*1** Plaintiff Robert Arroyo brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishments by delaying for eight months allegedly necessary surgery for an inguinal hernia. Defendants have moved for summary judgment on various grounds, including Plaintiff's failure to exhaust administrative remedies, the failure to proffer evidence of deliberate indifference to Plaintiff's serious medical needs, the lack of personal involvement by the individual Defendants, qualified immunity, the failure to plead an unconstitutional pattern or practice by the municipal Defendants, the fact that the Department of Corrections and Correctional Health Services are agencies that may not be sued, and, to the extent that Plaintiff implies that he may have claims under state law, the failure to file a notice of claim.

*Failure to Exhaust Administrative Remedies*

[1] The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) provides that a prisoner may not bring an action pursuant to 42 U.S.C. § 1983 or any other Federal law until he has exhausted any available administrative remedies. In this case, Plaintiff failed to pursue his administrative remedies, and for that reason alone, this action must be dismissed.

In October 1998, Plaintiff filed a grievance stating that he had been denied surgery for a hernia that caused him great pain and suffering. His complaint was heard in a first level informal proceeding, in which it was proposed that it be resolved as follows:

"On 10/26/98 the IGRC contacted the Clinic Manger. Grievant will be called down to have an examination. Action requested is accepted."

Plaintiff accepted this resolution, and was further examined in the clinic at Riker's Island. When that examination resulted only in further non-surgical interventions, and he was not scheduled promptly for surgery, he did not renew his grievance or otherwise seek to use the extensive five step inmate grievance resolution program that is in place at Riker's Island. His failure to do so precludes this action, despite his claim that it would have been irrational for him to appeal what he perceived to be a favorable result. Even if Plaintiff though that he had been promised prompt surgery after his informal grievance review, shortly thereafter he obviously knew that surgery had not been performed, or even scheduled. He presents no explanation as to why he did not at least inquire as to why surgery that he allegedly thought he had been promised had not been forthcoming.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

*Denial of Medical Care*

[2] Even if Plaintiff had exhausted his administrative remedies, he has not sufficiently stated a claim for violation of the Eighth Amendment. In order to state a claim for an unconstitutional denial of medical care, a plaintiff must prove "deliberate indifference" to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The deliberate indifference standard has both an objective and a subjective component. First, the alleged condition must be objectively "sufficiently serious." Such seriousness has been defined as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Subjective complaints of pain are not sufficient to satisfy this standard. *Espinal v. Coughlin,* 98 Civ. 2579 (RPP), 2002 U.S. Dist. LEXIS 20, *9 (S.D.N.Y. Jan. 2, 2002); *Chatin v. Artuz,* No. 95 Civ. 7994(KTD), 1999 U.S. Dist. LEXIS 11918, *11 (S .D.N.Y. Aug. 4, 1999), *aff'd,* 2002 U.S.App. LEXIS 86 (2002) ("[Plaintiff's] alleged problems in his left foot may indeed be very real. His pain is not, however, of the type contemplated for satisfaction of the objective standard." (citing *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990)). Second, the Defendant must:

*2 know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Hathaway v. Coughlin,* 37 F.3d at 66 (2d Cir.1994) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).

Charges that amount only to allegations of malpractice, and mere disagreements with respect to the quality of medical care do not state an Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S. Ct at 292 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). *See also Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Espinal v. Coughlin,* 2002 U.S. Dist. LEXIS 20, *10; *Brown v. McElroy,* 160 F.Supp.2d 699, 705-06 (S.D.N.Y.2001); *Culp v. Koenigsmann,* 99 Civ. 9557(AJP), 2000 U.S. Dist. LEXIS 10168, *32 (S.D.N.Y. July 19, 2000). Accordingly, a delay in treatment does not violate the Eighth Amendment unless it involves an act or a failure to act that evinces "a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)); *Espinal v. Coughlin,* 2002 U.S. Dist. LEXIS 20, *9 ("The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years.").

Application of the deliberate indifference standard to the facts of this case makes clear that summary judgment must be granted in favor of the Defendants. First, Plaintiff's inguinal hernia was not objectively a "serious" enough condition to satisfy the objective prong of the test. In *Gonzalez v. Greifinger,* No. 95 Civ. 7932(RWS), 1997 U.S. Dist LEXIS 18677, *7 (S.D.N.Y. Nov. 22, 1997), the Court found that an 11 month delay in surgically repairing the plaintiff's umbilical hernia, followed by surgery that resulted in complications, failed to satisfy the constitutional serious medical need standard.

Other courts have found objectively insufficient claims

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

relating to a toothache, *Tyler v. Rapone,* 603 F.Supp. 268, 271-72 (E.D.Pa.1985), a broken finger, *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252-53 (D.Me.1988), and pain in the knee, *Espinal v. Coughlin,* 2002 U.S. LEXIS 20, *9. *See also Abdul-Akbar v. Dept. of Corrections,* 910 F.Supp. 986, 1006 (D.Del.1995), *aff'd,* 111 F.3d 125 (3rd Cir.), *cert. denied,* 522 U.S. 852, 118 S.Ct. 144, 139 L.Ed.2d 91 (1997) ("It is questionable whether a hernia is a 'serious medical need.' ').

In this case, Plaintiff's condition was not "one of urgency that may produce death, degeneration, or extreme pain," and was far less serious than the types of conditions that have been found to constitute "serious medical needs." Plaintiff has not alleged, let alone presented evidence to show, that his condition was, at any point, "fast degenerating" or "life threatening," or that Defendants delayed necessary medical treatment in order to punish him.

**\*3** Secondly, with respect to the subjective prong, all that Plaintiff has alleged is negligence. There is no evidence that Plaintiff ever was denied medical treatment. To the contrary, he testified that he was promptly taken to the clinic whenever he asked to be, and it is clear that he was seen in the clinic at Riker's Island more than 30 times during the eight month period at issue here.[FN1] Also, there is ample evidence in the record of attempts to ameliorate Plaintiff's condition without surgery. The hernia, which Plaintiff first noticed 1993, and which was repeatedly diagnosed as a reducible hernia, was reduced at least twice. He was prescribed pain medication, a scrotal support, various trusses, ice packs, elevation, and a surgical consultation was requested. Ultimately, in January 1999, the hernia was surgically repaired at Kings County Medical Center. These interventions were consistent with the diagnosis made and treatment prescribed at Beth Israel Hospital one month before Plaintiff was incarcerated. There too he was diagnosed with an "easily reducible RIH

[right inguinal hernia]," and told to purchase a scrotal support, or truss, for comfort. At that time, he also was given an appointment for a surgical consultation, which he did not attend. [FN2]

> **FN1.** In addition to treatment for the hernia, Plaintiff was treated for a number of other conditions while incarcerated at Riker's Island. He received medical attention for drug dependency, mental health issues, dyspepsia, heartburn, and ingrown toe nails, and was prescribed eyeglasses at the Riker's Island clinic. Thus, there is absolutely no evidence his medical needs were ignored by Defendants.

> **FN2.** Plaintiff's alleged urgent need and desire for surgery is further undercut by his refusal to undergo prescribed surgery for a left inguinal hernia, which was diagnosed and scheduled at the time of the surgical repair of the right inguinal hernia.

Moreover, Plaintiff has not alleged that the hernia became worse,[FN3] or that his general condition deteriorated as a result of the alleged delay in surgery. The evidence also is that, unlike in *Gonzalez v. Greifinger,* 1997 U.S. Dist. LEXIS 18677, the surgery ultimately was performed successfully and without complications.

> **FN3.** His allegation is that the hernia was, at all times, the size of a softball.

Finally, Defendants have presented evidence that attempting to treat a hernia conservatively prior to performing surgery constitutes reasonable medical practice. Plaintiff, on the other hand, did not present any

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

medical opinion testimony to support his argument that it was unreasonable to first attempt to treat his hernia non-surgically, and to resort to surgery only after such methods had failed. *See Culp v. Koenigsmann,* 2000 U.S. Dist. LEXIS 10168, *11. Accordingly, Plaintiff has failed to meet his burden of proof in opposition to Defendants' motion for summary judgment. *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Cifarelli v. Village of Babylon,* 25 C.C.P.A. 785, 93 F.2d 47, 51 (2d Cir.1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

It also appears that Plaintiff has not alleged that the municipal Defendants engaged in a pattern or practice of indifference to prisoners' medical needs, as required by *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Nor has Plaintiff alleged any personal participation by Dr. Ye Hum Kim. However, in light of the foregoing, there is no need to address either these issues or the Defendants' claims of qualified immunity. Furthermore, having dismissed all of Plaintiff's federal claims, the Court also will dismiss whatever state law claims he intended to state pursuant to this Court's supplemental jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Conclusion*

**\*4** For the foregoing reasons, Defendants' motion for summary judgment is granted and the Second Amended Complaint is dismissed.

SO ORDERED.

S.D.N.Y.,2003.
Arroyo v. City of New York
Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2009 WL 801612 (D.Conn.)
(Cite as: 2009 WL 801612 (D.Conn.))

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Jason M. DAY, Plaintiff,
v.
Theresa C. LANTZ, et al., Defendants.[FN1]

FN1. Named as defendants in the complaint are
Theresa C. Lantz, Edward Blanchette, Ricardo
Ruiz, Scott Stephenson, Dr. Castro, Patricia
Ottolini, Nasirkuau and John Does. On May 17,
2007, a videoconference was conducted for the
purpose of screening the pro se complaint in
accordance with 28 U.S.C. § 1915A. The Court
subsequently issued a ruling and order permitting
Eighth Amendment claims to proceed against
defendants Castro, Ruiz, Ottolini and Khan (who
was listed in the complaint as "Nasirkuau"). All
other claims were dismissed. See Day v. Lantz,
487 F.Supp.2d 30 (D.Conn.2007). Familiarity
with the Court's ruling and order is assumed.

No. 3:07-CV-388(RNC).

March 25, 2009.

Jason M. Day, Cheshire, CT, pro se.

Neil D. Parille, Attorney General's Office, Hartford, CT,
for Defendants.

*RULING AND ORDER*

ROBERT N. CHATIGNY, District Judge.

**\*1** Plaintiff, an inmate in the custody of the Connecticut
Department of Correction ("DOC"), brings this action
pursuant to 42 U.S.C. § 1983 claiming that persons
responsible for providing health care services to DOC
inmates have failed to provide him with proper treatment
for an inguinal hernia in violation of the Eighth
Amendment.[FN2] Defendants have filed a motion for
summary judgment contending, among other things, that
they have not been deliberately indifferent to plaintiff's
medical needs. I agree and therefore grant the motion.

FN2. An inguinal hernia is a protrusion of the
abdominal cavity through the inguinal canal
located in the anterior abdominal wall.

I. *Standard of Review*

Summary judgment may be granted when there is no
"genuine issue as to any material fact" and the movant is
"entitled to judgment as a matter of law." Fed.R.Civ.P.
56(c). To withstand a properly supported motion for
summary judgment, the opposing party must come
forward with "specific facts showing that there is a
genuine issue for trial." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986). In opposing summary
judgment, plaintiff must not "replace conclusory
allegations of the complaint ... with conclusory allegations
of an affidavit" but instead must offer "significant
probative evidence tending to support the complaint."
Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 801612 (D.Conn.)
(Cite as: 2009 WL 801612 (D.Conn.))

(1990)(internal quotations omitted).

In evaluating the evidence, the court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004). When the nonmoving party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments they suggest. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

II. *Background*

Plaintiff has been in DOC custody since 1981. He has been diagnosed with paranoid schizophrenia and has difficulty trusting others, including health care providers.

In February 2005, plaintiff was transferred to Garner Correctional Institution, where he came under the care of Dr. Raymond Castro. On April 28, 2005, plaintiff saw Dr. Castro. He complained of a lump on the left side of his groin and reported that it had been there for six months. Dr. Castro found a small inguinal hernia and noted that it was easily reduced (i.e. manually put back in place). Dr. Castro provided the plaintiff with a truss to keep the hernia in place and advised him to call if the hernia became nonreducible.

In January 2006, plaintiff was transferred to Cheshire Correctional Institution. On June 21, 2006, he was seen by Dr. Ricardo Ruiz. Dr. Ruiz found that the plaintiff had a "large (grapefruit-sized) nonreducible indirect inguinal hernia" and noted that the plaintiff was complaining of pain and discomfort. Dr. Ruiz asked DOC's Utilization Review Committee ("URC") to approve a surgical consult. On June 27, this request was approved by the URC.

**\*2** On August 14, 2007, the plaintiff was taken to the University of Connecticut Health Center ("UCONN") for a surgical consult. He was examined by Dr. Nasir Khan. Dr. Khan found that the plaintiff had an inguinal hernia on the left side and recommended that it be surgically repaired as soon as possible. The URC approved the recommended surgery and directed that it be done at UCONN.

Plaintiff did not like the way Dr. Khan treated him during the surgical consult, particularly Dr. Khan's refusal to provide his name in response to plaintiff's request and his abrupt rejection of plaintiff's request that the surgery be performed under local anesthesia. Plaintiff wants to have the surgery done under local anesthesia to avoid the potential complications of general anesthesia.

Plaintiff subsequently informed Dr. Ruiz that he was uncomfortable with the surgeon he saw at UCONN (i.e.Dr.Khan) because of the way the surgeon treated him. He asked Dr. Ruiz for help in arranging to have the surgery performed at another facility under local anesthesia. Dr. Ruiz refused this request.

On November 30, 2006, plaintiff wrote to Nurse Patricia Ottolini, the Director of Treatment and Addiction Services for the DOC. Plaintiff described the negative experience he had at UCONN and Dr. Ruiz's refusal to help. He stated that he was in constant pain and discomfort due to the hernia and asked to be treated at a facility other than UCONN.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 801612 (D.Conn.)
(Cite as: 2009 WL 801612 (D.Conn.))

On December 11, 2006, Ottolini responded to the plaintiff in writing. She stated that surgical care was available to him only through UCONN and that the type of anesthesia he would receive had to be determined by the surgeon and anesthesiologist. She urged the plaintiff to make a "responsible decision."

In March 2007, plaintiff filed this case claiming that Drs. Castro and Ruiz had failed to timely and adequately treat his hernia and that Drs. Ruiz and Khan and Director Ottolini were being deliberately indifferent to his medical needs by failing and refusing to have the hernia surgically repaired in accordance with his wishes.

III. *Discussion*

Under the Eighth Amendment, prisoners have a right to receive medical treatment for serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 103 (1976). To prove a denial of medical care in violation of the Eighth Amendment, a prisoner must prove that the defendant acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *see also Wilson v. Seiter,* 501 U.S. 294, 303 (1991). An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This culpable state of mind is equivalent to criminal recklessness. *Id* . at 839-40; *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). An inmate's disagreement with a treating physician's choice of treatment is insufficient to support a constitutional claim. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *see also Estelle,* 429 U.S. at 105-06. Judged in light of these well-established principles,

plaintiff's claims do not raise a proper issue for trial and the defendants are entitled to judgment as a matter of law.

*Dr. Castro*

**\*3** Plaintiff alleges that Dr. Castro exhibited deliberate indifference by prescribing a truss when the plaintiff's hernia was first diagnosed in April 2005 instead of arranging for a surgical repair. Dr. Castro responds that the hernia was easily reducible and, accordingly, a truss was an appropriate form of treatment.

Courts have recognized that a reducible hernia is not sufficiently serious to satisfy the objective prong of a deliberate indifference claim. *See Nichols v. Pesanti,* 2005 WL 356776, at \*4 (D.Conn. Feb. 11, 2005); *Arroyo v. City of New York,* No. 99 Civ. 1458(JSM), 2003 WL 22211500, at \*2 (S.D.N.Y. Sept. 25, 2003); *Iniquez v. Chief Medical Officer,* No. C 02-3294 MMC, 2002 WL 31750217, at \*2 (N.D.Cal. Dec. 3, 2002). Even assuming plaintiff's condition was objectively serious, there is no evidence to support a finding that Dr. Castro, in deciding to rely on a truss to treat the easily reducible hernia, consciously disregarded an unreasonable risk of serious harm to the plaintiff's health.

In response to the motion for summary judgment, the plaintiff has asserted that Dr. Castro gave him the wrong type of truss. *See* Pl.'s Response and Objection (Doc. 39) at 7. Plaintiff's assertion fails to raise an issue for trial because it is conclusory in nature and unsupported by competent evidence. Accordingly, Dr. Castro is entitled to summary judgment.

*Dr. Ruiz*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 801612 (D.Conn.)
(Cite as: 2009 WL 801612 (D.Conn.))

Plaintiff claims that his hernia has worsened because of Dr. Ruiz's deliberate indifference. It is unclear whether this claim is based on acts or omissions by Dr. Ruiz before or after the plaintiff had his surgical consult at UCONN. Construing the claim broadly to encompass both time periods, it does not raise a proper issue for trial.

The record before the Court reflects no complaint by the plaintiff to Dr. Ruiz (or anyone else) concerning a lump or other condition associated with his hernia until he was examined by Dr. Castro in April 2005 and found to have a small hernia that was easily reducible. When Dr. Ruiz subsequently examined the plaintiff in June 2006, the hernia had gotten worse and was no longer reducible. A nonreducible hernia is a serious medical condition. However, there is no evidence that Dr. Ruiz knew the plaintiff was suffering from a serious medical condition before the examination in June 2006. The record establishes that when Dr. Ruiz examined the plaintiff and found that the hernia was no longer reducible, he promptly requested approval of a surgical consult and his request was granted. Thus, with regard to the period culminating in the referral for a surgical consult, plaintiff cannot prove that Dr. Ruiz was deliberately indifferent to a serious medical need.

With regard to the subsequent period, plaintiff's claim appears to be that Dr. Ruiz has been deliberately indifferent in failing to take steps to persuade DOC to provide the plaintiff with surgery at a facility other than UCONN under local anesthesia. This claim is unavailing. Plaintiff has not shown that Dr. Ruiz is personally responsible for deciding where the surgery should be performed or what type of anesthesia should be used. The record establishes that the surgery is routine in nature and there is no allegation or evidence that the surgeons at UCONN are not capable of performing it. The issue of which type of anesthesia should be used is not for Dr. Ruiz to decide. Accordingly, Dr. Ruiz is entitled to summary

judgment.

C. *Dr. Khan*

**\*4** Plaintiff's claim against Dr. Khan, construed generously, appears to be that Dr. Khan was deliberately indifferent in failing to accommodate plaintiff's request that the surgery be performed by another surgeon at another hospital under local anesthesia. There is no evidence that Dr. Khan had any role in plaintiff's health care other than providing the surgical consult at UCONN. Plaintiff cannot show that Dr. Khan was deliberately indifferent in connection with the surgical consult. Nor is there evidence of any other constitutional violation by Dr. Khan. Accordingly, the claim against him does not raise a proper issue for trial.

D. *Patricia Ottolini*

Plaintiff claims that Director Ottolini was deliberately indifferent to his complaints and failed to credit his reasonable refusal to consent to surgery at UCONN. The record establishes that Ottolini investigated plaintiff's concerns and advised him of her conclusions in a timely manner. Plaintiff has not shown that her rejection of his request evinces deliberate indifference to a serious risk to his health in violation of the Eighth Amendment. Thus, plaintiff cannot recover against Ottolini.

III. *Conclusion*

Defendants' motion for summary judgment is hereby granted. The Clerk may enter judgment and close the file.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2009 WL 801612 (D.Conn.)
(Cite as: 2009 WL 801612 (D.Conn.))

So ordered.

D.Conn.,2009.
Day v. Lantz
Slip Copy, 2009 WL 801612 (D.Conn.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern

District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

FN1. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that while incarcerated in Bare Hill Correctional Facility ("Bare Hill") and Altona Correctional Facility ("Altona"), defendants violated his rights under the Eighth and Fourteenth Amendments.[FN2] In particular, plaintiff alleges that prison officials maintained overcrowded facilities resulting in physical and emotional injury to the plaintiff and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify

double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

**Sentencing and Punishment 350H** ⟨key⟩ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
Alleged eight-month delay of allegedly necessary surgery for an inmate's inguinal hernia did not amount to cruel and unusual punishment under the Eighth Amendment; the hernia was not a serious enough condition to satisfy the objective prong of the test, and as to the subjective prong, all that the inmate alleged was negligence. U.S.C.A. Const. Amend. 8.

OPINION & ORDER

MARTIN, J.

**\*1** Plaintiff Robert Arroyo brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishments by delaying for eight months allegedly necessary surgery for an inguinal hernia. Defendants have moved for summary judgment on various grounds, including Plaintiff's failure to exhaust administrative remedies, the failure to proffer evidence of deliberate indifference to Plaintiff's serious medical needs, the lack of personal involvement by the individual Defendants, qualified immunity, the failure to plead an unconstitutional pattern or practice by the municipal Defendants, the fact that the Department of Corrections and Correctional Health Services are agencies that may not be sued, and, to the extent that Plaintiff implies that he may have claims under state law, the failure to file a notice of claim.

*Failure to Exhaust Administrative Remedies*

[1] The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) provides that a prisoner may not bring an action pursuant to 42 U.S.C. § 1983 or any other Federal law until he has exhausted any available administrative remedies. In this case, Plaintiff failed to pursue his administrative remedies, and for that reason alone, this action must be dismissed.

In October 1998, Plaintiff filed a grievance stating that he had been denied surgery for a hernia that caused him great pain and suffering. His complaint was heard in a first level informal proceeding, in which it was proposed that it be resolved as follows:

"On 10/26/98 the IGRC contacted the Clinic Manger. Grievant will be called down to have an examination. Action requested is accepted."

Plaintiff accepted this resolution, and was further examined in the clinic at Riker's Island. When that examination resulted only in further non-surgical interventions, and he was not scheduled promptly for surgery, he did not renew his grievance or otherwise seek to use the extensive five step inmate grievance resolution program that is in place at Riker's Island. His failure to do so precludes this action, despite his claim that it would have been irrational for him to appeal what he perceived to be a favorable result. Even if Plaintiff though that he had been promised prompt surgery after his informal grievance review, shortly thereafter he obviously knew that surgery had not been performed, or even scheduled. He presents no explanation as to why he did not at least inquire as to why surgery that he allegedly thought he had been promised had not been forthcoming.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

*Denial of Medical Care*

[2] Even if Plaintiff had exhausted his administrative
remedies, he has not sufficiently stated a claim for
violation of the Eighth Amendment. In order to state a
claim for an unconstitutional denial of medical care, a
plaintiff must prove "deliberate indifference" to his
serious medical needs. *Estelle v. Gamble,* 429 U.S. 97,
104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The
deliberate indifference standard has both an objective and
a subjective component. First, the alleged condition must
be objectively "sufficiently serious." Such seriousness has
been defined as "a condition of urgency, one that may
produce death, degeneration, or extreme pain." *Hathaway
v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,*
513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).
Subjective complaints of pain are not sufficient to satisfy
this standard. *Espinal v. Coughlin,* 98 Civ. 2579 (RPP),
2002 U.S. Dist. LEXIS 20, *9 (S.D.N.Y. Jan. 2, 2002);
*Chatin v. Artuz,* No. 95 Civ. 7994(KTD), 1999 U.S. Dist.
LEXIS 11918, *11 (S .D.N.Y. Aug. 4, 1999), *aff'd,* 2002
U.S.App. LEXIS 86 (2002) ("[Plaintiff's] alleged
problems in his right foot may indeed be very real. His
pain is not, however, of the type contemplated for
satisfaction of the objective standard." (citing *Liscio v.
Warren,* 901 F.2d 274, 277 (2d Cir.1990)). Second, the
Defendant must:

*2 know of and disregard an excessive risk to inmate
health or safety; the official must both be aware of facts
from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also
draw the inference.

*Hathaway v. Coughlin,* 37 F.3d at 66 (2d Cir.1994)
(quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct.
1970, 1979, 128 L.Ed.2d 811 (1994)).

Charges that amount only to allegations of malpractice,
and mere disagreements with respect to the quality of
medical care do not state an Eighth Amendment claim.
*Estelle v. Gamble,* 429 U.S. at 105-06, 97 S. Ct at 292
("Thus, a complaint that a physician has been negligent in
diagnosing or treating a medical condition does not state
a valid claim of medical mistreatment under the Eighth
Amendment. Medical malpractice does not become a
constitutional violation merely because the victim is a
prisoner."). *See also Chance v. Armstrong,* 143 F.3d 698,
703 (2d Cir.1998); *Espinal v. Coughlin,* 2002 U.S. Dist.
LEXIS 20, *10; *Brown v. McElroy,* 160 F.Supp.2d 699,
705-06 (S.D.N.Y.2001); *Culp v. Koenigsmann,* 99 Civ.
9557(AJP), 2000 U.S. Dist. LEXIS 10168, *32 (S.D.N.Y.
July 19, 2000). Accordingly, a delay in treatment does not
violate the Eighth Amendment unless it involves an act or
a failure to act that evinces "a conscious disregard of a
substantial risk of serious harm." *Chance v. Armstrong,*
143 F.3d 698, 703 (2d Cir.1998)); *Espinal v. Coughlin,*
2002 U.S. Dist. LEXIS 20, *9 ("The Second Circuit has
'reserved such a classification for cases in which, for
example, officials deliberately delayed care as a form of
punishment, ignored a 'life-threatening and
fast-degenerating' condition for three days, or delayed
major surgery for over two years.").

Application of the deliberate indifference standard to the
facts of this case makes clear that summary judgment must
be granted in favor of the Defendants. First, Plaintiff's
inguinal hernia was not objectively a "serious" enough
condition to satisfy the objective prong of the test. In
*Gonzalez v. Greifinger,* No. 95 Civ. 7932(RWS), 1997
U.S. Dist LEXIS 18677, *7 (S.D.N.Y. Nov. 22, 1997), the
Court found that an 11 month delay in surgically repairing
the plaintiff's umbilical hernia, followed by surgery that
resulted in complications, failed to satisfy the
constitutional serious medical need standard.

Other courts have found objectively insufficient claims

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

relating to a toothache, *Tyler v. Rapone,* 603 F.Supp. 268, 271-72 (E.D.Pa.1985), a broken finger, *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252-53 (D.Me.1988), and pain in the knee, *Espinal v. Coughlin,* 2002 U.S. LEXIS 20, *9. *See also Abdul-Akbar v. Dept. of Corrections,* 910 F.Supp. 986, 1006 (D.Del.1995), *aff'd,* 111 F.3d 125 (3rd Cir.), *cert. denied,* 522 U.S. 852, 118 S.Ct. 144, 139 L.Ed.2d 91 (1997) ("It is questionable whether a hernia is a 'serious medical need.' ').

In this case, Plaintiff's condition was not "one of urgency that may produce death, degeneration, or extreme pain," and was far less serious than the types of conditions that have been found to constitute "serious medical needs." Plaintiff has not alleged, let alone presented evidence to show, that his condition was, at any point, "fast degenerating" or "life threatening," or that Defendants delayed necessary medical treatment in order to punish him.

**\*3** Secondly, with respect to the subjective prong, all that Plaintiff has alleged is negligence. There is no evidence that Plaintiff ever was denied medical treatment. To the contrary, he testified that he was promptly taken to the clinic whenever he asked to be, and it is clear that he was seen in the clinic at Riker's Island more than 30 times during the eight month period at issue here.[FN1] Also, there is ample evidence in the record of attempts to ameliorate Plaintiff's condition without surgery. The hernia, which Plaintiff first noticed 1993, and which was repeatedly diagnosed as a reducible hernia, was reduced at least twice. He was prescribed pain medication, a scrotal support, various trusses, ice packs, elevation, and a surgical consultation was requested. Ultimately, in January 1999, the hernia was surgically repaired at Kings County Medical Center. These interventions were consistent with the diagnosis made and treatment prescribed at Beth Israel Hospital one month before Plaintiff was incarcerated. There too he was diagnosed with an "easily reducible RIH

[right inguinal hernia]," and told to purchase a scrotal support, or truss, for comfort. At that time, he also was given an appointment for a surgical consultation, which he did not attend. [FN2]

> **FN1.** In addition to treatment for the hernia, Plaintiff was treated for a number of other conditions while incarcerated at Riker's Island. He received medical attention for drug dependency, mental health issues, dyspepsia, heartburn, and ingrown toe nails, and was prescribed eyeglasses at the Riker's Island clinic. Thus, there is absolutely no evidence his medical needs were ignored by Defendants.

> **FN2.** Plaintiff's alleged urgent need and desire for surgery is further undercut by his refusal to undergo prescribed surgery for a left inguinal hernia, which was diagnosed and scheduled at the time of the surgical repair of the right inguinal hernia.

Moreover, Plaintiff has not alleged that the hernia became worse,[FN3] or that his general condition deteriorated as a result of the alleged delay in surgery. The evidence also is that, unlike in *Gonzalez v. Greifinger,* 1997 U.S. Dist. LEXIS 18677, the surgery ultimately was performed successfully and without complications.

> **FN3.** His allegation is that the hernia was, at all times, the size of a softball.

Finally, Defendants have presented evidence that attempting to treat a hernia conservatively prior to performing surgery constitutes reasonable medical practice. Plaintiff, on the other hand, did not present any

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

medical opinion testimony to support his argument that it was unreasonable to first attempt to treat his hernia non-surgically, and to resort to surgery only after such methods had failed. *See Culp v. Koenigsmann,* 2000 U.S. Dist. LEXIS 10168, *11. Accordingly, Plaintiff has failed to meet his burden of proof in opposition to Defendants' motion for summary judgment. *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Cifarelli v. Village of Babylon,* 25 C.C.P.A. 785, 93 F.2d 47, 51 (2d Cir.1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

It also appears that Plaintiff has not alleged that the municipal Defendants engaged in a pattern or practice of indifference to prisoners' medical needs, as required by *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Nor has Plaintiff alleged any personal participation by Dr. Ye Hum Kim. However, in light of the foregoing, there is no need to address either these issues or the Defendants' claims of qualified immunity. Furthermore, having dismissed all of Plaintiff's federal claims, the Court also will dismiss whatever state law claims he intended to state pursuant to this Court's supplemental jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Conclusion*

**\*4** For the foregoing reasons, Defendants' motion for summary judgment is granted and the Second Amended Complaint is dismissed.

SO ORDERED.

S.D.N.Y.,2003.
Arroyo v. City of New York
Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be
GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint
be dismissed without prejudice as to the unserved John
Doe defendant pursuant to Fed.R.Civ.P. 4(m) and
N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this
Report-Recommendation and Order, by regular mail, upon
parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge
written objections to the foregoing report. Such objections
shall be filed with the Clerk of the Court. FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN DAYS
WILL PRECLUDE APPELLATE REVIEW. *Roldan v.
Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary
of Health and Human Services,* 892 F.2d 15 (2d
Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a),
6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1277592 (S.D.N.Y.)
(Cite as: 2000 WL 1277592 (S.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Antoine GRANT, Plaintiff,
v.
BURROUGHS, As Correctional Officer, Kowinski, As
Correctional Officer, John Doe # 1, As Correctional
Officer, John Doe # 2, As Correctional Officer, John
Doe # 3, As Correctional Officer, Josey, As
Correctional Sergeant, Lynn Lilley, As Food Service
Administrator II, John P. Keane, As Superintendent of
Sing Sing, Grianer, As Deputy Superintendent of
Security, Hamaway, E., As Nurse at Sing Sing, John
Doe # 4, As Doctor at Sing Sing, John Doe # 5, As
Doctor at Sing Sing, St. Agnes Hospital Medical Staff
White Plains, et al. Defendants in their official and
individual capacity at Sing Sing Correctional Facility,
Defendants.
**No. 96 Civ. 2753(MGC).**

Sept. 8, 2000.

Antoine Grant, Bare Hill Correctional Facility, Malone,
New York, Plaintiff, pro se.

Rende, Ryan & Downes, LLP, White Plains, New York,
By: Wayne M. Rubin, for Defendant St. Agnes Hospital.

Eliot Spitzer, Attorney General of the State of New York,
New York, New York, By: Alfred A. Delicata, Edward J.
Curtis, Jr., Assistant Attorneys General, for Defendants
Burroughs, Kowinski, Josey, Lilley, Keane, Grainer,
Hamaway, and John Does # 1-5.

*OPINION*

CEDARBAUM, J.

**\*1** Antoine Grant filed this action pursuant to 42 U.S.C. §
1983 for alleged infliction on him of cruel and unusual
punishment in violation of the Eighth Amendment while
he was incarcerated at the Sing Sing Correctional Facility
in Ossining, New York ("Sing Sing"). Plaintiff asserts two
claims. First, the complaint alleges that Burroughs,
Kowinski, Josey, Lilley, and John Does 1-3 failed to
prevent another inmate from physically assaulting and
injuring Grant. Second, the complaint alleges that E.
Hamaway and John Does 4 and 5, medical personnel at
Sing Sing, and "St. Agnes Hospital medical staff White
Plains" refused to provide Grant with pain medication and
failed adequately to treat an injury to his cheek that
resulted from the assault. [FN1]

> FN1. Plaintiff stated at his deposition that he no
> longer wished to pursue his action against
> defendants John P. Keane, Superintendent of
> Sing Sing, and Grianer, Deputy Superintendent
> of Security, because they were not personally
> involved in the incidents giving rise to plaintiff's
> claim. (Pl. Dep. at 32:5-12.) Accordingly,
> plaintiff's claims against defendants Keane and
> Grianer are dismissed.

Defendants employed by Sing Sing and St. Agnes Hospital
have moved separately for summary judgment pursuant to
Fed.R.Civ.P. 56(c). Both motions are unopposed.
Defendants served plaintiff with the motions accompanied

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1277592 (S.D.N.Y.)
(Cite as: 2000 WL 1277592 (S.D.N.Y.))

by the notice required by the Second Circuit, including a statement that plaintiff's claims could be dismissed without a trial if he failed to respond. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Despite these clear warnings that his claim could be dismissed if he did not respond, plaintiff has not replied to or acknowledged either motion.[FN2] For the following reasons, both motions are granted.

> FN2. Plaintiff has also failed to respond to an order to show cause issued on October 18, 1999. That order was prompted by plaintiff's failure to submit a narrative statement of facts to be proved at trial and stated:
>
>> Antoine Grant is hereby ORDERED TO SHOW CAUSE why this action should not be dismissed for failure to prosecute in view of the fact that Grant has failed to submit a written narrative statement of the facts that he will prove at trial as directed in an August 9, 1999 letter sent to him by certified mail.
>
> Plaintiff has yet to respond to this order. His complaint could therefore be dismissed for failure to prosecute.

### UNDISPUTED FACTS

On August 12, 1995 a fellow inmate, Rodney Elliot, assaulted plaintiff in Sing Sing's mess hall where plaintiff had been assigned to work. Prior to the physical attack, plaintiff and Elliot had had a dispute. Lilley, a food service administrator, heard the argument and came over to ask plaintiff if everything was all right. Plaintiff replied that it was.

Shortly thereafter, plaintiff was eating in the kitchen. Plaintiff alleges that Elliot came into the kitchen through an open and unguarded gate. Plaintiff contends that defendant Kowinski should have been standing guard at this gate and that Elliot should not have had access to the kitchen. In the kitchen, Elliot attacked plaintiff with a razor blade. Plaintiff was injured in the assault, with lacerations of his cheek, shoulder, and head. Plaintiff was provided preliminary first aid at the Sing Sing medical facilities and was sent to St. Agnes Hospital for further treatment.

Josey took plaintiff to St. Agnes Hospital where his wounds were sutured. Plaintiff was released the same day with instructions to return to St. Agnes Hospital if he experienced redness, swelling, or numbness of the face. Otherwise, plaintiff was advised to return to St. Agnes Hospital in ten days to have the sutures removed.

Plaintiff returned to St. Agnes Hospital on August 16, 1995 with a complaint of swelling of his left cheek. The treating physician noted that plaintiff's left cheek was swollen, but did not show signs of infection such as redness or discharge. The treating physician recommended that plaintiff continue to take antibiotics.

*2 Plaintiff again returned to St. Agnes Hospital on August 30, 1995. The emergency department physician noted that plaintiff's left cheek remained swollen, but was not tender. Again, there were no signs of infection. As the physician was cleaning the swollen area, it drained spontaneously and the swelling was resolved. Plaintiff was discharged and instructed to return in seven days for reevaluation. Plaintiff complained of swelling and minor discomfort or pain on three subsequent occasions at Sing Sing-September 27, 1995, November 8, 1995, and June

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1277592 (S.D.N.Y.)
(Cite as: 2000 WL 1277592 (S.D.N.Y.))

20, 1996.

### DISCUSSION

I. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.

II. Eighth Amendment Claims

A. Deliberate Indifference to a Threat to Health or Safety

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). This requirement obligates prison officials to "protect prisoners from violence at the hands of other prisoners ." Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.1988)).

However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834, 114 S.Ct. at 1977. An inmate's Eighth Amendment right is violated only if the prison officials acted with deliberate indifference to the inmate's safety. "Mere negligence will not suffice." Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 620 (2d Cir.1996).

**\*3** In order to show that defendants violated the Eighth Amendment by deliberate indifference to a threat to his health or safety plaintiff must make both an objective and a subjective showing. The objective showing required is that plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834, 114 S.Ct. at 1977. The subjective showing required is that the prison official accused of wrongdoing had a "sufficiently culpable state of mind." Id. (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991)). That is, he must have "know[n] of and disregard[ed] an excessive risk to [plaintiff's] health or safety." Id. at 837, 114 S.Ct. at 1979.

Plaintiff's own deposition testimony shows that he is unable to establish either of the two parts of the deliberate indifference test. First, plaintiff has not made an objective showing that he was incarcerated under conditions posing a substantial risk of serious harm. Plaintiff stated in his deposition that he worked with Elliot in the mess hall. (Pl.

Not Reported in F.Supp.2d, 2000 WL 1277592 (S.D.N.Y.)
(Cite as: 2000 WL 1277592 (S.D.N.Y.))

Dep. at 19:18.) Plaintiff also stated that he did not have a prior history of problems with Elliot other than the "bickering the inmates do" which plaintiff characterized as "not a serious thing." (Pl. Dep. at 20:8-9.) Even after his heated dispute with Elliot on August 12, 1995, plaintiff responded to Lilley's inquiry about the argument by telling him that "everything was all right." (Pl. Dep. at 17:15.) There is no evidence from which a jury could conclude that plaintiff was at risk of an attack by Elliot because of his conditions of confinement.

Second, plaintiff cannot make the required showing that defendants knew of and disregarded a risk to plaintiff's health or safety. Plaintiff has provided no evidence that there was any prior problem between Elliot and himself of which any of the corrections officers or staff were or should have been aware. In fact, he admits that no such problem existed. (Pl. Dep. at 20:8-9.) Plaintiff has also provided no evidence that Lilley or any other defendant knew or should have known that Elliot would return to attack him physically after their argument ended. Even if Kowinski was away from his assigned post, his negligent supervision of the area is not sufficient for liability under § 1983. *See Hayes,* 84 F.3d at 620. Plaintiff does not claim that he was not assisted once he was assaulted physically. Thus, plaintiff has not provided any evidence from which a jury could conclude that defendants were deliberately indifferent to an excessive risk to his health or safety.

B. Deliberate Indifference to Serious Medical Need

A prisoner's Eighth Amendment right to be free of cruel and unusual punishment applies to prison doctors [FN3] providing medical care to inmates. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In order to show that a denial of medical care is unconstitutional under the Eighth Amendment, a plaintiff

must show that medical care providers acted with "deliberate indifference to [his] serious medical needs." *Id.* at 104, 97 S.Ct. at 291.

FN3. St. Agnes Hospital concedes for the purposes of this motion that it may be considered a state actor subject to § 1983 liability. (Hospital Def. Mem. at 6.)

*4 The test for deliberate indifference has both an objective and a subjective component. The objective showing required is that "the alleged deprivation [is] ... 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson v. Seiter,* 501 U.S. at 298, 111 S.Ct. at 2324). The subjective showing required is that "the charged official [acted] with a sufficiently culpable state of mind." *Id.* "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979).

Plaintiff's claim fails both prongs of the deliberate indifference test. First, his condition was not "sufficiently serious." In order to rise to the level of a constitutional violation, defendants must have deliberately ignored " 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). In his amended complaint, plaintiff alleges that Nurse Hamaway, a nurse at Sing Sing, denied him pain medication. He also alleges that the medical staff at St. Agnes hospital "refused to order medication for pain and swelling." (Am. Compl. at 4.) In his deposition plaintiff states that he was in pain for two months from the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1277592 (S.D.N.Y.)
(Cite as: 2000 WL 1277592 (S.D.N.Y.))

swelling around the laceration of his cheek. (Pl. Dep. at 34:3-5.) However, plaintiff's medical records reveal that plaintiff's condition was not "a condition of urgency" or "one that may produce death, degeneration, or extreme pain." *Id.* at 66. Even taking plaintiff's deposition statement that he was in pain for two months as true, plaintiff's pain was not so severe as to constitute a serious medical condition. Plaintiff was provided pain medication at Sing Sing on August 13, 1995, one day after the assault, with apparent good result. (Haydock Aff. Ex. 4 at 6.) On August 14 plaintiff's medical record from Sing Sing reported that plaintiff had "no complaints." (*Id.* at 7.) Similarly, there is no record that plaintiff complained about pain on August 15 or August 16 when he consulted with Sing Sing medical personnel. (*Id.* at 24-25.) The record of plaintiff's August 16, 1995 visit to St. Agnes Hospital does not reflect that plaintiff complained of pain. (Haydock Aff. Ex. 2 at 2-3.) On August 30, 1995 a St. Agnes physician noted that plaintiff reported "minimal discomfort." (Haydock Aff. Ex 4 at 10.) His intermittent complaints thereafter, on September 27, 1995, November 8, 1995, and June 20, 1996, do not show "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

**\*5** Second, defendants did not act with deliberate indifference to plaintiff's medical needs. Plaintiff's complaint is not that he was refused treatment. Plaintiff repeatedly consulted with medical personnel. Rather, plaintiff's complaint is that in his judgment he should have received pain medication when medical personnel did not believe his condition required pain medication. Although a prisoner is entitled to medical care, he does not have the right to the treatment of his choice. *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). A difference of

opinion between a physician and a prisoner patient does not implicate the prisoner's constitutional rights. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867-68 (2d Cir.1970). *See also Hendrickson v. Emergency Med. Servs.,* No. Civ.A. 95-4392, 1996 WL 472418, at *2 (E.D.Pa. Aug. 20, 1996)* (although plaintiff argued that he should have been given something stronger than Advil or Tylenol for pain, "mere disagreements over medical judgment do not state Eighth Amendment claims") (quoting *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990)). At best, plaintiff alleges medical malpractice. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Plaintiff has not shown that defendants were deliberately indifferent to his serious medical needs.

CONCLUSION

For the foregoing reasons both motions for summary judgment are granted. To the extent that plaintiff's claims against the medical defendants may be characterized as state law claims for medical malpractice, I decline to exercise supplemental jurisdiction over those claims. Accordingly, the action is dismissed.

SO ORDERED.

S.D.N.Y.,2000.
Grant v. Burroughs
Not Reported in F.Supp.2d, 2000 WL 1277592 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
David STEPHENSON, Plaintiff,
v.
ALBANY COUNTY POLICYMAKERS, et al.,
Defendants.
**Civ. No. 6:09-CV-326 (LEK/RFT).**

Aug. 14, 2009.

David Stephenson, Marcy, NY, pro se.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** The Clerk has sent to the Court a civil rights Complaint
(Dkt. No. 1), Motion to Proceed *In Forma Pauperis* (IFP)
(Dkt. No. 2), Motion for Joinder of Claims (Dkt. No. 3),
and a Motion to Appoint Counsel and Conduct Discovery
(Dkt. No. 6), filed by *pro se* Plaintiff David Stephenson,
who is currently incarcerated at Marcy Correctional
Facility.[FN1] In his *pro se* Complaint, Stephenson alleges
civil rights violations based upon, *inter alia,* malicious
prosecution, abuse of process, conspiracy, fraud, invasion
of privacy, and attorney malpractice. For a more complete
statement of Plaintiff's claims, reference is made to the
Complaint.

FN1. In 2006, Stephenson filed a civil rights
action in this Court, pursuant to 42 U.S.C. §
1983, *Stephenson v. Herrick,* Civ. No.
1:06-CV-1466 (GLS/DRH), which was
dismissed by the Court, *sua sponte,* for failure to
state a claim upon which relief could be granted.
Stephenson's Petition for a Writ of *Habeas
Corpus,* pursuant to 28 U.S.C. § 2254, is also
pending in this Court, *Stephenson v.
Superintendent,* Civ. No. 9:08-CV-1243
(LEK/RFT).

**I. DISCUSSION**

**A. Application to Proceed *In Forma Pauperis***

Plaintiff has submitted an *In Forma Pauperis* Application.
The Prison Litigation Reform Act (PLRA), codified in
part at 28 U.S.C. § 1915(b), provides that an inmate who
seeks *in forma pauperis* status is required to pay over a
period of time the full amount of the filing fee provided
for in 28 U.S.C. § 1914(a), which is currently $350.00 for
most civil actions. After reviewing Plaintiff's Application,
we find that he may properly proceed *in forma pauperis.*

**B. Allegations Contained in the Complaint**

Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed *in forma
pauperis,* "the court shall dismiss the case at any time if
the court determines that ... the action or appeal (i) is
frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C.
§ 1915(e)(2)(B). Thus, it is a court's responsibility to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

determine that a plaintiff may properly maintain his complaint before permitting him to proceed further with his action.

Moreover, under 28 U.S.C. § 1915A, a court must, as soon as practicable, *sua sponte* review "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employees of a governmental agency" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §§ 1915A(a) & (b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir.1999) (*per curiam* ).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.*, 885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983)); *see also Myers v. Wollowitz*, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). In this action, Plaintiff seeks to hold Defendants liable for various alleged constitutional violations, including, but not limited to:

**\*2** • conspiracy claims against all Defendants;

• claims for malicious prosecution and abuse of process against Defendants Mark Haskins, New York State Bureau of Narcotics, P. David Soares, Albany County District Attorney, and Christopher Baynes, Albany County Assistant District Attorney;

• claims of "undue influence and fraud" against Defendants Haskins, Albany County Task Force, and Albany County Prosecutors;

• claims of "common law fraud" and attorney malpractice against Defendant F. Stanton Ackerman, his court appointed attorney;

• invasion of privacy claims against Defendants Haskins, Andrew Zostant, Town of Colonie Police Detective, Steven Heider, Town of Colonie Police Superintendent, and other members of the Albany County Task Force for interfering with Plaintiff's expectation of privacy and private communications without probable cause; and

• what appears to be a *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), claim against Albany County for various policies and customs.

*See generally* Compl.

The initial impediment to Plaintiff's pursuit of this action is aptly summarized in Plaintiff's Complaint: "The Plaintiff has a pending Federal Habeas Corpus Petition in the Northern District of New York Federal Court, Case No. 9:08-CV-1243. **This 1983 action and complaint is intended to supplement that Petition, as these claims for money damages are relevant to the same set of facts.**" Compl. at ¶ 17 (emphasis added). Indeed, as Plaintiff overtly admits, this entire § 1983 action (including state claims for malpractice and fraud) relates to events leading up to and including his guilty plea and sentence in Albany County Court in 2006.[FN2] The Supreme

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

Court has held that

> FN2. A similar *fait accompli* vanquished
> Stephenson's prior attempt to sue various
> individuals in this Court, *Stephenson v. Herrick,
> et al.,* Civ. No. 1:06-CV-1466 (GLS/DRH).
> Upon information and belief, the core events
> giving rise to Stephenson's prior § 1983 action
> are the same events giving rise to the current
> action. That prior civil rights action was
> dismissed in light of *Heck v. Humphrey,* 512
> U.S. 477 (1994). *See Stephenson v. Herrick, et
> al.,* Civ. No. 1:06-CV-1466, Dkt. No. 9,
> Decision and Order, dated Mar. 8, 2007.

in order to recover damages for allegedly unconstitutional
conviction or imprisonment, or for other harm caused
by actions whose unlawfulness would render a
conviction or sentence invalid, a § 1983 plaintiff must
prove that the conviction or sentence has been reversed
on direct appeal, expunged by executive order, declared
invalid by a state tribunal authorized to make such
determination, or called into question by a federal
court's issuance of a writ of habeas corpus, 28 U.S.C. §
2254. A claim for damages bearing that relationship to
a conviction or sentence that has not been so invalidated
is not cognizable under § 1983.
*Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994).

Plaintiff's claims in this action are barred because he has
failed to show that his conviction or sentence has been
overturned. *See Duamutef v. Morris,* 956 F.Supp. 1112,
1115-18 (S.D.N.Y.1997) (dismissing § 1983 claims of
malicious prosecution, false arrest, perjury, retaliation, and
civil rights conspiracy under *Heck* where the plaintiff's
underlying conviction had not been overturned). Because
all of Plaintiff's claims relate to events that gave rise to
Plaintiff's conviction and the sentence he is currently

serving, many of which are currently interposed in his
pending *Habeas Corpus* Petition, [FN3] this action is barred
under *Heck* and we recommend dismissal pursuant to 28
U.S.C. § 1915(e)(2)(B)(i) and (ii) as it lacks an arguable
basis in law. We note that this recommendation is limited
to all § 1983 claims asserted by Plaintiff. Plaintiff has also
inserted some state law claims sounding in fraud and
attorney malpractice. It is not clear whether Plaintiff
intended to assert these claims in support of his § 1983
claims, or if he intended them to stand on their own,
thereby invoking the Court's pendent jurisdiction to
entertain state law claims. To the extent they are part and
parcel of the § 1983 claims, then they too suffer the same
infirmity and are barred by *Heck*. To the extent, however,
that they are purely state law claims, in light of this Court's
recommendation of dismissal of the federal claims, we
would recommend the Court not exercise pendent
jurisdiction of such state law claims, pursuant to 28 U.S.C.
§ 1367, which authorizes a federal court to decline to
exercise supplemental jurisdiction over a state claim if all
of the claims over which the court had original jurisdiction
were dismissed. 28 U.S.C. § 1367(c)(3).

> FN3. Stephenson raises the following grounds,
> *inter alia,* in support of his *Habeas* Petition:
>
> 1) he was denied equal protection and due
> process in state court when he was denied,
> *inter alia,* a grand jury and was subjected to an
> insufficient accusatory process and was victim
> of an illegal search and seizure;
>
> 2) he was a victim of selective prosecution and
> "Mode of Proceedings error"; and
>
> 3) his guilty plea was unknowing and
> unintelligent due to ineffective assistance of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

counsel.

*Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT), Dkt. No. 1, Pet.

### C. Other Pending Motions

**\*3** Presently pending in this matter are Plaintiff's Motions for Joinder of Claims, Appointment of Counsel, and to Conduct Discovery. In light of the Court's recommendation of full dismissal, we find it unnecessary at this juncture to adjudicate such claims. Should the District Judge assigned to this matter accept this recommendation, such Motions would be automatically terminated upon the closing of this case. If, however, the recommendation is not accepted, the Clerk shall forward this file to the undersigned for consideration of these Motions.

**WHEREFORE,** it is hereby

**ORDERED,** that Plaintiff's *In Forma Pauperis* Application (Dkt. No. 2) is **granted;** and it is further

**RECOMMENDED,** that pursuant to the Court's review under 28 U.S .C. § 1915 and § 1915A, Plaintiff's entire Complaint be should be **dismissed** as barred by *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994), and the Court should decline to exercise pendent jurisdiction over any purported state claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED,** that in the event the District Court does not adopt the above recommendation, the entire file be returned to the undersigned for consideration of Plaintiff's other Motions (Dkt. Nos. 3 & 6); and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on August 14, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 7). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff David Stephenson, which were filed on August 24, 2009. Objections (Dkt. No. 8).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

**\*4** Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
7) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that pursuant to the Court's review under 28
U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint
is **DISMISSED WITHOUT PREJUDICE,** pending the
outcome of Plaintiff's pending habeas petition; and
accordingly all other pending Motions in this case (Dkt.
Nos. 3 and 6) should be **DENIED** and **DISMISSED;** and
it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.
Stephenson v. Albany County Policymakers
Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.